THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT L. HICKS, Defendant-Appellant.

(No. 52939;

First District—June 25, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Elliot M. Samuels and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Defendant was convicted, after a jury trial, of the offense of murder. Judgment was entered and he was sentenced to seventeen to twenty-five years. On appeal defendant's principal contentions, as set forth in his counsel's brief and in his *pro se* brief covering additional points and authorities, include: (1) that he did not receive a fair trial because of prejudicial cross-examination and improper rebuttal testimony; (2) that the trial court erred in refusing to delay the trial and compel the attendance of defense witnesses; (3) that the trial court erred in instructing the jury; (4) that he was not adequately or properly informed of his constitutional rights; and (5) that he was not proved guilty beyond a reasonable doubt.

The evidence presented at trial may be summarized. Margaret Szymanski, the wife of Stanley Szymanski (hereinafter "deceased"), went to defendant's home in the early morning hours of January 5, 1967, to persuade her husband to leave defendant's home. Upon her arrival at defendant's home she was told by defendant to "Get away from here." Defendant then picked up a carbine rifle, aimed it at her and threatened to blow her head off. She disarmed defendant and struck him with the butt of the rifle. The blow inflicted by her caused defendant to bleed

from the forehead and above the nose. Defendant phoned the police and they arrived at his home shortly thereafter. The police asked Mrs. Szymanski to leave. Her husband remained behind.

Mrs. Szymanski also testified that when she saw deceased in the early morning on January 5th she was unable to form an opinion as to whether or not he was drunk. Occasionally deceased would drink beer. Deceased was employed as a furniture mover and he worked at both Joyce Brothers and Mayflower. On January 4, 1967, he worked for Mayflower until 6:30 P.M.

At approximately 8:45 A.M. on January 5, 1967, Police Officer Paul Stubblefield, in response to a call, went to 8501 South Dorchester Avenue in Chicago. Upon his arrival his attention was first drawn to a small broken window in the front door. He then knocked on the door and defendant answered. Defendant immediately told him, "I shot him because he hit me in the head in my own house." Stubblefield then saw deceased lying on the floor and a shotgun lying on a cot. During this period of time defendant kept talking and only after defendant stated, "I put one shell in that gun and I shot him," was he able to place defendant under arrest and inform him of his constitutional rights.

Stubblefield did not think that anyone could insert his hand through the broken section of the front door window. He did not notice the odor of alcohol on the deceased or defendant. Defendant had a dried cut on his forehead but no other marks.

Detective William Boreczky arrived at defendant's home at about 9:00 A.M. on January 5, 1967. He spoke with Sergeant Connelly as to what transpired prior to his arrival. He was introduced to defendant and he advised defendant of his constitutional rights. However, before he could say more, defendant said to him, "I shot him because he hit me * * * I had to do it, I shot him because he hit me." Boreczky noticed "a coagulated laceration superficial cut" on defendant's forehead.

Approximately one hour later, having accompanied defendant to the police station, Boreczky again informed defendant of his constitutional rights. After having talked with his attorney, defendant still continued to tell him what occurred. Defendant told Boreczky that deceased came to his home on January 4th at about 10:00 P.M.; that they had several drinks together; and that deceased left at 3:30 A.M. on January 5th. Around 8:00 A.M. on January 5th defendant was awakened by a loud pounding at the front door. Defendant went to the door and allowed deceased to enter and they had "about" two drinks together. At this time deceased got up and for no reason struck defendant in the face. Defendant then warned deceased, "Stanley, you may be bigger than me, but if you hit me again, I will kill you." Thereupon defendant alleged that

the deceased grabbed him by the throat and that upon breaking away, he went behind the divan where he had a 20 gauge shotgun. Defendant then loaded one shell into the chamber and fired point blank at deceased.

Boreczky also testified that he noticed no blood on the telephone in defendant's home.

Dr. Eugene Tapia, called as a State's witness, testified that he performed an autopsy on deceased. In his opinion a shotgun blast to the face was the cause of deceased's death. He also found that the alcohol in deceased's blood was 215 milligrams. In his opinion deceased was intoxicated.

For the defense, evidence was introduced to establish the character and reputation of the deceased as being "a moocher for a buck" and "pretty rough." There was also testimony that deceased was forty-one years old, standing six feet, two inches tall and weighing about 190 pounds and that defendant was fifty-seven years old, standing five feet nine inches tall and in poor health, suffering from coronary insufficiency, cirrhosis of the liver and high blood pressure, and that as a result of an automobile accident he walked with a limp.

David Hicks, defendant's son, testified for the defense. Around 8:00 or 8:30 A.M. on January 5, 1967, he heard a sound like an air rifle, only a little louder. He went downstairs and saw deceased on the floor. Defendant told him, "He hit me several times and went through my pockets. I am going to call the police." Defendant also told him that deceased broke into the house. David ran upstairs, got dressed and left the house. In his opinion defendant was not drunk on January 5th.

David saw the broken window in the front door but he did not know when it was broken. He heard some bickering before he heard a noise like a rifle but he could not make out what was being said. He did not hear anyone come in the house between 1:30 and 8:30 A.M. on January 5th. Defendant kept a single barrel shotgun, an M-1 rifle with bullets, and a small pistol in the house. The shotgun was loaded at all times. Deceased and defendant were friends most of the time. However, when defendant would not give deceased money, deceased would get mad. Several days before January 5th deceased asked defendant for $125 or $150. Defendant said that he did not have the money.

Dr. Frank Fiortse, testifying for the defense, stated that a person with 215 milligrams of alcohol in his blood could be violent. (This was his opinion grounded upon a hypothetical question based on the evidence which referred to the deceased.)

Defendant testified in his own behalf. On January 4, 1967, at approximately 4:00 P.M., deceased came to his door and was let in. Several minutes later Mrs. Szymanski came over and she and deceased started to

fight. He called his attorney who advised him to call the police. The police came over and put Mrs. Szymanski out of the house. Deceased remained with him. He denied that Mrs. Szymanski struck him with his carbine but stated that she kicked him. Shortly thereafter he again called his attorney who asked deceased to leave defendant's home and deceased complied.

On January 5, 1967, at 8:30 A.M., deceased came into his home uninvited. Defendant asked deceased to leave. Deceased refused, started swearing at defendant and demanded money from him. Defendant again pleaded with deceased to leave his home. He went to call the police. Deceased grabbed the phone first and hit him over the back of the neck with it. Deceased continued to beat defendant, hitting him four or five times with his hands. After deceased knocked him down, deceased went through his pocket looking for money. Deceased let defendant get up and then pushed him into a chair. Deceased then walked away and went to the staircase to see if defendant's son had awakened. At this time defendant picked up a shotgun that was standing near the chair and pointed the gun at deceased's shoulder. Deceased returned and sat at the foot of defendant's bed, facing defendant. Deceased threatened to kill defendant with his bare hands, whereupon defendant stated, "Leftie, please [leave] my home, don't try to hit me any more." Deceased lunged at defendant and the gun went off, killing deceased. Defendant believed that deceased ran into the gun and it went off.

Defendant called the police and a priest. When the first police officer arrived he told the officer that deceased broke in, hit him and tried to get money from him. He said, "He [deceased] got shot." Shortly thereafter he signed a written statement at the police station.

Defendant also testified that Mrs. Szymanski was not in his home during the early morning hours of January 5th. She never took a rifle away from him nor did she hit him with a rifle over the eye.

Deceased hit him in the back of the neck, kicked him and hit him a number of times. He never made a statement to Officer Stubblefield that he shot deceased because deceased hit "me in the head in my own house. I put one shell in that gun [pointing to a .20 gauge shotgun] and shot him."

He bought a pistol from his brother-in-law but he did not know whether it had any shells in it. He did not even look at it. He put the pistol on the shelf and gave his brother-in-law $20. The glass in the front door was broken when he knocked his elbow against it.

Deceased was in good physical condition. Defendant once saw deceased pick up the front end of his car.

Defendant also testified that a Tim Leary accused deceased of beating him up; that six weeks prior to the shooting deceased "for no reason at all" struck him and knocked the wind out of him.

In rebuttal the State called several witnesses. John Miller, a police officer, testified that he accompanied defendant to the hospital. Defendant's treatment amounted to a bandage being applied to defendant's forehead. He noticed no other new marks on defendants' body which required treatment.

Shirley Augustyn testified that two days prior to deceased's death she was in defendant's kitchen when she heard a crash and saw defendant pointing an M-1 rifle at her husband through a broken window in the front door.

Linda Augustyn, Shirley's fifteen year old daughter, testified that four or five days prior to deceased's death, defendant pointed a pistol at her head.

Anton Prunckle, a police officer with the Chicago Police Department, testified that he advised defendant of his constitutional rights at defendant's home. Defendant volunteered that he had shot deceased and agreed to give a written statement at the police station. When they arrived at the station the witness again repeated the constitutional warnings. However, on advice of defendant's attorney, defendant refused to give a written statement. Thereafter, defendant told the witness that "he would be able to beat this because he's got a lot of money."

Immediately after resting the State's case in rebuttal the prosecutors, outside the presence of the jury, asked leave to introduce into evidence defendant's prior 1935 murder conviction. The prosecutors stated that it had slipped their minds and that it was oversight on their part. The trial court allowed the State to reopen its case and introduce the prior conviction record into evidence.

In surrebuttal defendant testified that the front door window was broken when he fell against the door and his elbow hit the window. He was not drunk on the morning of January 5, 1967.

The jury found defendant guilty of murder.

*Opinion*

■■ Defendant contends that he did not receive a fair trial because of prejudicial cross-examination and improper rebuttal testimony. Part of the misconduct to which defendant refers is his cross-examination wherein the following occurred:

"Q. I see. How would you describe yourself, Mr. Hicks. Are you a peaceful man?

Mr. Schelly: Objection, your Honor.

The Court: Sustained.

\* \* \*

Q. Have you ever been drunk, Mr. Hicks?

Mr. Schelly: Objection, your Honor.

The Court: Sustained.

Mr. Schelly: I ask that counsel refrain from continuing this line of questioning.

\* \* \*

Q. You are a very generous man, Mr. Hicks?

Mr. Schelly: Objection, your Honor.

The Court: Sustained.

\* \* \*

Q. Have you ever been high or loaded, sir?

Mr. Schelly: Objection, your Honor.

The Court: Sustained.

\* \* \*

Q. You never used one of your weapons to frighten or threaten anyone, did you?

Mr. Schelly: I will object to this. It is improper cross examination, your Honor.

The Court: I haven't heard the question yet.

\* \* \*

A. I never loaded the M-1 Carbine.

Q. Have you ever used that-

A. I never shot it.

Q. You never shot it?

A. Never.

Q. Have you ever used that weapon to threaten anyone?

Mr. Schelly: Objection, your Honor.

The Court: Sustained.

Mr. Montelione: Have you ever used that weapon in any manner to protect yourself?

Mr. Schelly: Objection.

The Court: Sustained.

Mr. Montelione: Q. Mr. Hicks, have you ever used that weapon?

Mr. Schelly: Objection.

The Court: Sustained."

■■ This line of inquiry was not relevant to the sole issue to be decided by the jury: whether defendant's use of deadly force against the deceased was justified. Conduct such as that exhibited by the prosecutors in the instant case has been widely condemned. This prejudicial error is not

cured by the trial judge's sustaining objections to the improper cross-examination. (*People v. Bush,* 300 Ill. 532; *People v. Decker,* 310 Ill. 234; *People v. Harges,* 87 Ill.App.2d 376; and *People v. Ring,* 89 Ill.App.2d 161. See too *People v. Nuccio,* 43 Ill.2d 375, and *People v. Mack,* 120 Ill. App.2d 149.) As the court in *People v. Smith,* 413 Ill. 218, 223, said: "A man is not to be convicted of a crime merely because he is a bad man generally or has committed other crimes for which he has not been punished."

In the instant case we believe that the prosecutor's questioning of defendant on cross-examination was so improper and prejudicial as to deprive defendant of a fair trial.

Defendant next argues that the State introduced improper rebuttal testimony. He claims that the testimony offered in rebuttal did not rebut his evidence but instead tended to prove the commission of prior unrelated criminal acts by him. Defendant specifically refers to the rebuttal testimony of Linda Augustyn, Shirley Augustyn and Officer Anton Prunckle.

In rebuttal fifteen year old Linda Augustyn testified that four or five days prior to deceased's death she was at defendant's house at about 2:00 or 3:00 P.M. The following colloquy then occurred:

"Q. Did Mr. Hicks at that time have a pistol?

A. Yes.

Q. What was he doing with that pistol?

A. Well, I was over at the neighbor's house, Mr. Aronof and he told me that—

MR. SCHELLY: Objection.

THE COURT: We just want to know what you saw Mr. Hicks do?

THE WITNESS: He pointed the gun at my head.

MR. SCHELLY: Objection, your Honor.

THE COURT: Overruled.

MR. SCHELLY: I beg your pardon?

THE COURT: Overruled.

MR. WISE: Q. Was there some reason he pointed at your head?

A. Yes.

Q. Would you relate to the ladies and gentlemen why he pointed at your head?

A. He said—

THE COURT: Now, just a moment. I am not going to go into hearsay again, Mr. Wise."

Shirley Augustyn testified in rebuttal that two days prior to deceased's

death she was in defendant's kitchen when she heard a crash and saw defendant pointing an M-1 rifle out of the broken window. The trial judge then asked Mrs. Augustyn, "Just what did you see?" The witness replied, "I saw the gun sticking out of the broken window, and I asked what he was doing and he [defendant] said, "I am going to shoot your husband." Defendant objected and asked that the jury be instructed to disregard the statement. The trial judge instructed the jury to "disregard any statement that is stricken, including the one that was just made as to what she heard."

Officer Prunckle testified in rebuttal that defendant refused to give a written statement and that defendant told him "he would be able to beat this because he's got a lot of money."

Defendant argues that rebuttal evidence must be strictly limited to that which contradicts defendant's evidence, and that going beyond this for the purpose of introducing evidence revealing additional unlawful conduct is impermissible. He claims that how the window was broken, what he did with the other guns he owned or what he told Prunckle were in no way connected with the shooting of deceased and that any testimony relating to these incidents should not have provided the State with the justification for rebuttal evidence relating to prior criminal acts.

In *People v. Fuerback*, 66 Ill.App.2d 452, defendant was charged with armed robbery. He denied commission of the crime and offered an alibi in his defense that he was with his mother at the time of the robbery. In rebuttal a State's witness testified that ten minutes before the robbery in question defendant was in her store and that one hour later defendant returned and robbed the store. The court held that it was proper for the State to rebut defendant's alibi but that "the admission into evidence of that portion of the witness' testimony relating the details of the defendant's alleged participation in a crime separate and distinct from that for which he was being tried was prejudicial error." (Id. 455) See also *People v. Cage*, 34 Ill.2d 530, and *People v. Butler*, 133 Ill.App.2d 299, (N.E.2d).

In the instant case it was proper for the State to rebut defendant's testimony (1) as to how the front window was broken; (2) the fact that defendant did not merely place his pistol on a shelf and "didn't even look at it"; and (3) that he had signed a written statement concerning the murder. However, it was prejudicial as well as improper rebuttal to then show that defendant pointed an M-1 rifle at Shirley Augustyn's husband and threatened to kill him; and that defendant pointed a pistol at Linda Augustyn's head. While improper questions relating to these subjects had been asked of defendant on cross-examination, objections

were sustained (as set forth above in this opinion) so there was no testimony to rebut. It was also improper rebuttal to show that defendant said to Prunckle he could beat this (the murder charge) because he had a lot of money. This testimony was outside the scope of the defense evidence, and, relating to other alleged crimes or conduct was separate and distinct from that for which defendant was being tried and could only inflame the jury. As the court in *People v. Decker, supra,* 243, concluded "There is no question more damaging to a defendant with a jury than one that suggests or intimates that he is a criminal or has been charged with criminal offenses." We find this was prejudicial error which prevented defendant from obtaining a fair trial.

■■ Defendant also claims that his cross-examination after he testified in surrebuttal was improper and demeaned and ridiculed him before the jury. After defendant testified in surrebuttal the following improper cross-examination occurred

"Q. They all lied, right, all the police officers that took the stand lied?

A. I mean this, that statement that they wrote out, proved that they lied.

Q. Is that right. Did they all lie throughout this trial? Did they all lie? Just yes or no, it is very simple?

A. I believe they told many untruths.

Q. They told many untruths. And the Augustyns also lied, is that correct?

A. Mr. Schelly: Objection, your Honor.

The Court: Sustained. The jury will decide who told the truth in this case, Mr. Wise, as you know.

Mr. Wise: Q. As far as Linda, the little girl, did you drive her to school, Mr. Hicks?

Mr. Schelly: Objection.

The Court: Did he drive her to school?

Mr. Wise: Yes.

The Court: Sustained.

Mr. Wise: You state that she wasn't in your house on the date that she said she was?

A. She was not ever in my house alone, never.

Q. Then she lied, is that right?

Mr. Schelly: Objection. The jury can decide who lied, your Honor.

The Court: That's right. You are trying to revoke the privilege of the jury, Mr. Wise.

Mr. Wise: I am not trying to revoke—

The Court: The evidence will speak for itself. Let the jury decide.

Mr. Wise: I am just trying to show Mr. Hicks' feeling that he is being persecuted.

The Court: That's not the issue."

Defendant's opinion as to the veracity of the witnesses neither proved nor tended to prove his guilt or innocence. Further, it is within the province of the jury to determine which witnesses, whose testimony conflicts, are telling the truth. (See *People v. Long,* 407 Ill. 210.) This cross-examination, when considered together with the prior cross-examination of defendant, was prejudicial to defendant.

■■ Defendant next argues that the trial court erred in refusing to delay the trial and compel the attendance of defense witnesses. This is based upon an accused's constitutional right "to have compulsory process for obtaining witnesses in his favor." (United States Constitution, VI Amendment, and Illinois Constitution, Article II, Section 9.) The alleged error occurred on September 18, 1967, the fifth day of the trial when defendant moved the court to compel the attendance of two witnesses who had been subpoenaed on Saturday, September 16, 1967, and to delay the proceeding for that purpose. The trial judge denied defendant's motion based upon his erroneous belief that there was an improper service of the subpoenas since no witness fees had been tendered. On appeal both the State and defendant agree that there is no requirement that such witness fees be paid in criminal cases. However, the issue is whether the denial of defendant's motion was correct and not the trial court's reasoning. See *Stigler v. City of Chicago,* 48 Ill.2d 20.

One of the witnesses who failed to appear, the personnel manager of Joyce Brothers, was not served personally with a subpoena. Defendant testified that he handed a copy of the subpoena to a woman at Joyce Brothers who worked there.

Rule 17.3 (b) of the Circuit Court Rules (Criminal Division) provides:

"A subpoena may be served by the sheriff, by his deputy or by any person over 21 years of age and not a party. Service of a subpoena shall be made by delivering a copy thereof to the person named."

This rule is consistent with section 155 (2) of the Criminal Code which provides that a witness who is duly subpoenaed and neglects or refuses to attend shall be proceeded against and punished for contempt of the court. Ill. Rev. Stat., 1967, ch. 38, par. 155 (2).

Here defendant, a party to the action, served the subpoena on a

woman at Joyce Brothers who was not the person named in the subpoena. This attempted service was improper.

We do not believe that there was any infringement upon defendant's constitutional right to compel the attendance of this witness.

As to the other witness subpoenaed, defendant's daughter, the situation is different as she was served personally with a subpoena. It was explained to the court that if she were to be brought in as a witness she would testify that at different times the deceased had come to defendant's house asking for money, that he used foul language in front of the children, and that defendant had asked him to leave. Such testimony would have corroborated that of defendant in line with the basic theory of defense in the case. The State argues that the daughter's testimony would only have been cumulative, but, in support, points out only the testimony of a neighbor that she "had heard [deceased] was a professional moocher for a buck," and the testimony of defendant's son that deceased had sometimes gotten mad and walked out when defendant wouldn't lend him money. Neither of these witnesses was as clearly or fully corroborative of defendant's testimony as that of the daughter would have been, and we think it constituted error on the part of the court not to have compelled her attendance through enforcement of the subpoena.

■■ Defendant also contends that the court erred in instructing the jury. In his written motion for a new trial defendant argued in paragraph 14 that "The Court erred in refusing to give instructions offered by the defendant which were favorable to the defendant and would have properly stated the law." In his brief defendant refers to two particular instructions which he alleges were improperly refused. However, where a defendant fails to include in his written motion for a new trial his objections to the giving or refusal to give the specific instructions complained of, he waives any error as to those instructions. (*People v. Neukom,* 16 Ill.2d 340, and *People v. Miller,* 92 Ill.App.2d 245.) As the court in *Millner, supra,* 247, stated:

> "Another reason why the point relative to the giving of and refusal to give certain instructions by the court has not been preserved is the failure of the defendant to include in his written motion for new trial the giving of or refusal to give the specific instructions complained of. (*People v. Riggins,* 13 Ill.2d 134, 148 N.E.2d 450.) Where a defendant has filed a written motion for a new trial and has not assigned as error in the written motion the specific instructions complained of, he is deemed to have waived error as to those instructions. (*People v. Neukom,* 16 Ill.2d 340, 158 N.E.2d 53.) We will therefore not inquire whether the trial court erred in this respect."

■■ In his *pro se* brief defendant argues that he was not adequately or properly informed of his constitutional rights under *Miranda v. Arizona* (1965), 384 U.S. 436. However, the record clearly shows that defendant's first statements to Officer Stubblefield were volunteered and were not the result of police interrogation. Further, immediately upon defendant's arrest, Officer Stubblefield informed him of his constitutional rights, and Detective Boreczky twice informed defendant of his rights. Therefore, we find that as to these statements defendant was properly and adequately informed of his *Miranda* rights.

We note, however, that it was after defendant had refused to make a written statement that Officer Prunckle engaged him in further conversation without additional *Miranda* warnings, and defendant, according to Prunckle, boasted he would beat the charge because he had a lot of money.

Finally, defendant contends that he was not proved guilty beyond a reasonable doubt. He argues that since his testimony of self-defense was neither improbable nor contradicted, the State failed to prove his guilt. Defendant cites *People v. Jordan,* 4 Ill.2d 155, in support of his argument. In *Jordan, supra,* there were no contradictions between defendant's testimony and that of the other witnesses, and defendant's statements were corroborated by the surrounding facts and circumstances.

In the instant case, however, there are several contradictions between defendant's testimony and that of the State's witnesses. They include:

"(1) Mrs. Szymanski's testimony that at defendant's home during the early morning hours of January 5th she was threatened by defendant and that after defendant placed a rifle to her head, she disarmed him and struck him in the forehead with the butt of the rifle causing him to bleed, and defendant's denial that Mrs. Szymanski was there at the time or that she ever struck him on the head with a rifle but that she did kick him on January 4th at about 4:00 P.M.; and defendant's assertion that the wound inflicted upon him was caused by an assault committed by deceased on January 5th.

(2) Detective Boreczky's and Officer Stubblefield's testimony that on January 5th they arrived at defendant's home at 8:45 or 9:00 A.M. respectively and noticed only a coagulated laceration on defendant's forehead and other evidence which shows that there were no visible marks on defendant's neck or body nor blood on his telephone, and defendant's testimony that at approximately 8:30 A.M. on January 5th deceased struck him on the back of the neck with the telephone, that he was knocked down from the force of

the blow, was stomped on his back, got up, was hit four or five more times, and was knocked down again and fell on his face.

(3) Detective Boreczky's testimony that defendant stated to him that on the morning of January 5th at approximately 8:00 A.M. defendant opened the front door of his home and allowed deceased to enter, and that after deceased entered his home they had "about" two drinks of Vodka together, and defendant's denial that he invited deceased into his home or drank with deceased on January 5th."

Therefore, unlike *Jordan, supra,* there are contradictions in the evidence in the instant case, and the evidence of the State's witnesses, if believed by the jury, supports defendant's conviction.

Defendant also argues that Dr. Tapia's testimony shows that deceased's death was caused by a contact wound to the head which substantiates his claim that deceased was the aggressor and that the gun discharged only after deceased lunged at him. Defendant bases this argument on the fact that deceased, a much bigger and stronger man than he, was not likely to have surrendered his life so easily. However, the question of how the shooting occurred is one of fact and particularly within the province of the jury to decide. (*People v. St. Lucia,* 315 Ill. 258, and *People v. Gilbert,* 12 Ill.2d 410.) As the court in *Gilbert, supra* 413, stated:

"Where the defendant is the only person to testify to the actual facts of a homicide and for the purpose of establishing self-defense, the jury is not compelled to accept the defendant's statements. It may consider the surrounding circumstances, and the probability or improbability of his story. (*People v. Uher,* 375 Ill. 499; *People v. Jordan,* 4 Ill.2d 155.) If the defendant's version is probable, is corroborated, and not contradicted in its material parts, the jury may not disregard it. But the jury may reject it, in whole or in part, if it is so improbable as to seem incredible, even without contradictory evidence, or is contradicted by the facts and circumstances. *People v. Jordan,* 4 Ill.2d 155."

Whether or not a killing is justified under the law of self-defense is a question of fact to be determined by the jury under proper instructions. (*People v. Hurst,* 42 Ill.2d 217; *People v. Jordan,* 18 Ill.2d 489; and *People v. Johnson,* 112 Ill.App.2d 148.) Furthermore, the credibility of the witnesses and the weight to be given their testimony are for the jury to decide. (*People v. Hampton,* 44 Ill.2d 41, and *People v. Keane,* 127 Ill. App.2d 383.) Once a jury has decided these questions and reached a verdict, that finding will not be disturbed unless it is so unsatisfactory as

to leave a reasonable doubt of defendant's guilt. (*People v. Jordan,* 18 Ill.2d 489.) We find that the evidence was not so unsatisfactory as to cause a reasonable doubt of defendant's guilt.

For the reasons herein set forth the judgment is reversed and the cause is remanded for a new trial.

Reversed and remanded.

ENGLISH, P. J., and LORENZ, J., concur.