THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JACOB D. GRAVES, Defendant-Appellant.

First District (5th Division)   Nos. 77-120, 77-1044 cons.

Opinion filed June 16, 1978.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Renee Goldfarb, and Richard D. Heytow, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant, Jacob Graves, was indicted for the offenses of attempt murder and aggravated battery for the shooting of Alex Barber. A jury found defendant guilty on the aggravated battery charge, but not guilty of attempt murder, and he was sentenced to a term of two to six years. On appeal defendant contends that: (1) he was denied an opportunity to fully present his defense by the trial court's failure to admit certain evidence and testimony; (2) the trial court erred in failing to instruct the jury, *sua sponte*, regarding the justifiable use of force; (3) he was denied a fair trial by the prosecutor's inquiry as to whether defendant told the police his exculpatory story following his arrest; (4) the State improperly examined the defense character witnesses regarding their knowledge of the events of the alleged offense; (5) the State improperly examined defendant regarding the credibility of other witnesses, and by posing questions that assumed facts not in evidence; and (6) he was not proved guilty beyond a reasonable doubt.

We reverse and remand for a new trial. The pertinent facts follow.

Alex Barber, the victim, testified that on April 2, 1976, he went to Riddle's Lounge in Dixmoor, Illinois, at approximately 6:30 p.m. There were two coin-operated pool tables in the lounge and when Barber arrived he saw defendant playing pool with Alex Smoot. Barber had known both men for over three years, so he sat on a bar stool to watch the game. Smoot won the game, but defendant accused him of "fouling" so they played a second game, which Smoot also won. Defendant then started arguing with Smoot again over the first game, at which point

Barber offered to shoot a game of pool with Smoot and put a quarter in the table to release the balls.

Barber racked the balls to prepare for the game, but defendant took the cue ball from the table and told Smoot, "You won't play with this cue ball." Smoot then obtained another cue ball from behind the bar, and defendant started to push the rest of the balls into the pockets on the pool table. Barber then grabbed defendant's wrist and told him not to do that. Defendant responded that he would go get the key to open the table and retrieve the balls. He went into the back room of the lounge, approximately 15 feet away from the pool table, but while he was gone the barmaid opened the table with the key and let the balls down.

While Barber was again racking the balls he heard a commotion like someone had kicked over a bar stool. When he turned toward the noise, which had come from the rear of the lounge, he heard a shot and felt something strike him in the chest. He saw defendant standing approximately 15 feet away holding a gun with both hands and aiming it at his head. Defendant then fired a second shot which hit Barber in the right side of the face. The victim ran out of the lounge and looked back to see the defendant chasing him with the gun still in his hand. Barber ran into an alley where he collapsed, and someone called the police and an ambulance. Barber was taken to the hospital where he remained for three weeks. Surgery was performed on his chest and stomach, and the bullet which struck him in the face knocked out four teeth and left a scar where it exited below his ear.

Barber stated that he did not say anything to the defendant immediately before he was shot, and that he was not armed and did not threaten the defendant in any way.

Alex Smoot testified that he arrived at Riddle's Lounge on the day in question at about 5 p.m. Present when he arrived were defendant, the barmaid, and a man named Cecil. Defendant was shooting pool with Cecil but they started arguing and Cecil went to the bar. Smoot then offered to play defendant.

During their game defendant told Smoot he had fouled, so they played another game. Smoot won the second game, and when defendant started arguing again over the first game, Barber offered to play pool with Smoot. Defendant then grabbed the cue ball and raked the other balls into the pockets, and Barber grabbed his wrists. Defendant said he would get the key and went to the room in back of the bar, and the barmaid then came over and unlocked the table and released the balls.

The next thing Smoot knew he heard a shot like a firecracker and saw defendant standing next to the bar, holding a gun in his right hand over his left wrist and aiming it at Barber. When Smoot first heard the noise he saw Barber grab his side. He heard another sound like a firecracker and saw

light flash from the gun. Barber then ran out of the door and defendant ran after him. Smoot heard another shot from outside the building.

Smoot stated that the only words exchanged between Barber and defendant occurred when the latter was pushing the balls into the pockets. Barber did not say or yell anything to defendant after the defendant moved toward the back room to get the key. In the back room there was a door leading outside and a stairway leading to the living quarters above the lounge.

The court reporter's notes for the testimony of December 3, 1976, were lost. However, the parties stipulated to a summary of this testimony, which was filed as a supplemental record in this court. Three witnesses testified that day: Dr. Felix Davila and Sergeant Robert Vinson for the State; and Cecil Smith for the defense.

Dr. Davila testified that he examined Barber on April 2, 1976, and the victim had a wound in the upper lip, loose teeth, and an abdominal wound. He explored the abdomen but did not remove the bullet. After sewing up the incision an infection developed which was still being treated at the time of the trial.

Sergeant Vinson of the Dixmoor Police Department testified that at 6:30 p.m. on April 2, 1976, he was assigned to investigate a shooting. He found Barber sitting in a chair behind a barber shop at 14206 South Wood Street, bleeding from the mouth and stomach. The victim told Vinson that, "Jake shot me." After an ambulance came, Vinson went to the lounge and spoke with the owner, Mr. Riddle. Vinson found a .38 caliber bullet in the lounge.

The officer then proceeded to the hospital but returned to the lounge about 20 minutes later and spoke to Alex Smoot. While he was there Riddle received a telephone call. Vinson then went to Art's Roller Rink where he arrested the defendant. When Vinson arrived at the rink defendant was crying and shaking, and he told the officer that he had thrown the gun away and that he was temporarily living upstairs at Riddle's Lounge. Defendant inquired about Barber's condition and Vinson told him he was holding his own.

Cecil Smith testified for the defense that on the day of the incident he arrived at Riddle's Lounge between 5 and 6 p.m. He watched the defendant and Smoot play pool. Defendant's right hand was bandaged around the hand and fingers, but he was still able to play pool. During the game there was some discussion that Smoot had fouled the defendant; however, the latter said that they would let it go until after the game was over.

In the meantime Alex Barber came in and put a quarter in the slot and started to play a game of pool. At that point defendant took one of the balls and put it in the pocket and scattered the others. Barber told

defendant that he better give him a quarter because those were his balls. Defendant said he did not have a quarter and Barber told him, "Better get the keys or I'll cut your head off." Defendant said, "I'll get the key," and went into the back for three minutes. The barmaid got the key in the meantime and racked up a new set of balls. As defendant returned, Smith went in the back room by a washroom and watched from there. Defendant knocked over a heavy metal chair, calling attention to himself and the fact that he was carrying a gun. Defendant said something like, "Let me get out of here." As he passed by Barber, Barber swung at him with a cue stick and defendant fell to his knees, and as he did so he raised his arm and shot several times. Then he picked up his coat and hat and continued out.

Smith also stated that he had known defendant for three or four years, and he knew of no altercations between Barber and the defendant. Barber struck the defendant in the jaw when he spoke to him before demanding he get the key. When defendant returned he had the gun behind his back and to the side. Barber pulled his cue stick and reached in his pocket. Smith ran into the washroom after the first shot was fired. He only heard the other two or three shots. Smith did not remember how defendant had fired the gun. He never went to the police with his version of the incident.

Defendant testified in his own behalf that on April 2, 1976, he was living above Riddle's Lounge, and he had known Barber for two or three years. When the defendant was asked whether the victim had ever threatened him in the past, the State objected and a sidebar conference was held out of the presence of the jury.

In the course of that sidebar conference the trial judge noted that evidence of Barber's reputation would only be important if some evidence of self-defense was presented, which had not yet been done.

The defendant then presented an offer of proof. In that offer of proof the defendant testified to having several altercations with Barber prior to the day of the shooting, including one or two days before the shooting when the victim produced a knife. Noting that on the day of the shooting the defendant left the premises and returned with a gun, the trial judge stated that he still had not heard anything about self-defense.

The defendant then went on to testify concerning the events which led to the shooting. He testified that Barber stated he would cut the defendant's head off if he did not get the key to the pool table. He could not find the key. When the defendant came out of the back room with the gun he told Barber that he wanted to leave and at that time the victim lunged at him, raised his pool cue and put his hand in his pocket. Knowing that Barber carried a knife and a gun, the defendant turned his head and shot him and when he fell forward, the defendant fired again. The court

ruled that the defendant had not shown that he shot the victim in self-defense.

Direct examination of the defendant then continued in the presence of the jury. Defendant stated that on the night in question he was playing pool with Smoot when Barber entered the lounge. During the game Smoot fouled a shot and defendant began his shot. Smoot took a ball off the table and did not permit defendant to shoot. Defendant asked Smoot to please put the ball back on the table and Smoot complied by just throwing the ball on the table. After defendant lost the game, Smoot started an argument with him and it was at that point that defendant snatched the cue ball off of the table and put it in his pocket.

Barber then told Smoot that he would play a game with him and Smoot agreed. Barber put his quarter in the table. The balls came onto the table and defendant pushed some of the balls off of the table and into the holes. Barber came up behind defendant, called him a name, and struck him in the jaw and knocked him down when he turned around. Barber demanded a quarter and told defendant, "I will cut your god damn mother fucking head off." Defendant asked Barber to please leave him alone, and told him that he was sorry and that he would get the key. Barber pushed him and told him he would still cut his "god damn mother fucking head off" if he did not get the key. Defendant broke loose from Barber and got up and ran in the back where the key was kept. The key was not there.

Defendant saw a pistol in the room. He did not know whose pistol it was but was not his. He grabbed the pistol and proceeded backing out of the door into the bar. He kicked over the stool and Barber looked up. Defendant said, "All I want to do is leave up out of here. Let me out of here." Barber said, "You are not going anywhere." Barber, who was seated on a stool at a table that was set up for drinks, lunged toward him and swung the pool stick. Defendant ducked the pool stick, turned his head and fired because he was on his knees. When Barber fell towards him he fired again. Barber then hobbled out of the tavern. Defendant went on over and got his hat and coat, laid the gun down, and left. He did not follow Barber.

At about 6:45 he called the tavern and spoke to Rubin Riddle, the owner of Riddle's Lounge. Defendant asked how Barber was doing and Riddle responded that Barber was in the hospital. Defendant told him that he would like to give himself up to the police so that this whole matter could be settled. Riddle asked him where he was and he said he was at Art's Roller Rink in the bowling alley and that he would be waiting outside for the police. Officer Vinson and Henry Riddle arrived subsequently. They transported him to the Dixmoor Police Station.

On cross-examination defendant testified that the door leading to the

outside from the back room was not locked, but there was a Doberman Pinscher dog outside which prevented his using that door. After the shooting he laid the gun down and left, but he admitted telling the police he had thrown the gun away. Defendant also testified that he told the police that Barber had attacked him with the pool cue, and that Sergeant Vinson was lying if he testified that he did not so tell him. Both Barber and Smoot were lying when they testified that a third shot was fired outside the lounge.

Defendant further stated that when he fired at Barber it was to scare him and keep him away. Defendant did not know how far Barber was from him when he fired the first shot. He was on his knees and did not look when he fired. After the first shot Barber was some five feet away and he no longer held the cue stick, but when Barber slumped over and reached into his pocket, defendant fired again. Defendant did not hear Dr. Davila testify that the bullet traveled in a downward direction. He did not know that the bullet would not travel downward if he were on his knees and Barber was standing when he fired the shots.

On redirect examination the defendant was allowed to testify that the victim had a reputation in the community as being a violent man and a bully, but he was not allowed to testify concerning specific past acts of violence.

The defendant presented two character witnesses who testified that the defendant had a good reputation for peacefulness in the community. Both also testified that they were not present when the victim was shot and did not know what happened at Riddle's Lounge on April 2, 1976.

The defendant then rested.

Subsequently, just prior to the conference on instructions, defendant presented another witness to the court. The witness, Robert Fitzgerald, testified in an offer of proof that he had been drinking in Riddle's Lounge with Barber about a month before the trial. While conversing Barber told Fitzgerald that he had in fact struck defendant in the jaw before he went to get the key from the back room, but that he was going to "stick it" to the defendant anyway. Fitzgerald admitted he had not gone to the police with this information, and denied that he was being paid to testify. He had only informed defense counsel and defendant's wife about this conversation that very day. The trial court refused to reopen the case to allow the witness to testify.

Following instructions and closing arguments the jury found defendant guilty of aggravated battery and not guilty of attempt murder.

Opinion

Defendant contends initially that he was denied an opportunity to fully present his defense by the trial court's exclusion of certain evidence and

testimony. In reviewing the record we agree that two instances of trial court error occurred in this regard:

In the first instance, defendant attempted to testify that he had had prior altercations with Barber, and that the victim had committed recent acts of violence and made threats against the defendant. Specifically, defendant testified in an offer of proof that only two days before the instant occurrence there was an incident in which Barber had told him to move, and when he did not move fast enough, Barber pulled a knife on him. Another witness was also available to testify as to the same incident. The trial court excluded the proffered testimony, as well as evidence that defendant knew Barber carried knives and a gun, because he failed to see any evidence of self-defense. This was error.

■■ The rule is that evidence of specific acts of violence and threats made by the victim should be admitted in a prosecution where the defendant is claiming self-defense. (*People v. Singleton* (1976), 41 Ill. App. 3d 665, 354 N.E.2d 464.) While such evidence need only be admitted where some evidence of self-defense is introduced (see *People v. Allen* (1972), 50 Ill. 2d 280, 278 N.E.2d 762), substantial latitude should be allowed in this regard. (See *People v. Stombaugh* (1972), 52 Ill. 2d 130, 284 N.E.2d 640; *People v. Singleton.*) In this case there was a sufficient showing of self-defense to allow the introduction of such evidence, and its exclusion was prejudicial error.

■■ During his offer of proof defendant testified that Barber had struck and threatened him prior to his going in the back room to retrieve the key, and that he fired the weapon only after again being threatened by Barber, and assaulted with a cue stick, and after Barber reached into his pocket. In addition, Cecil Smith had already testified that Barber had struck and threatened defendant, and that when the latter attempted to leave the bar Barber swung at him with the pool cue and reached into his pocket. We find that this evidence was clearly sufficient to raise the issue of self-defense. (See *People v. Davis* (1963), 29 Ill. 2d 127, 193 N.E.2d 841; *People v. Moore* (1975), 27 Ill. App. 3d 337, 326 N.E.2d 420.) Therefore, evidence that Barber had on prior occasions threatened defendant with a knife, and that defendant knew he carried a knife and gun, was relevant and material to the jury's assessment of defendant's belief that his use of force was justified. See *People v. Williams* (1977), 45 Ill. App. 3d 338, 359 N.E.2d 736; *People v. Singleton; People v. Moore.*

In the second instance, defendant was precluded from testifying as to his state of mind during the occurrence in the lounge. Specifically, defendant attempted to testify that he was afraid of Barber, and that when he could not find the key in the back room he became even more afraid. Therefore, he grabbed the pistol and told Barber he just wanted to leave. He also attempted to testify as to his state of mind when Barber

came at him with the cue stick and reached in his pocket. The State's objections to all of the foregoing testimony were sustained by the court. This too was prejudicial error.

■■ In criminal cases where the intention, motive or belief of the accused is material to the issue, he is allowed to testify directly to that fact, and to have the circumstances surrounding the act considered in connection with his testimony. (*People v. Biella* (1940), 374 Ill. 87, 28 N.E.2d 111; *People v. Perry* (1974), 19 Ill. App. 3d 254, 311 N.E.2d 341.) In this case the excluded testimony went directly to the crucial issue of defendant's intent, motive, and belief. In support of his theory of the case, defendant had the right to testify as to his state of mind when he was struck and threatened by Barber, and when he could not find the key with which he had promised to return. (See *People v. Johnson* (1969), 108 Ill. App. 2d 150, 247 N.E.2d 10.) This testimony, if believed by the jury, could adequately explain defendant's reasons for returning to the front room of the lounge with the gun when he could not find the key. It might also provide a justification for defendant firing the second shot after Barber had dropped the cue stick and was reaching into his pocket. (*Cf. People v. Singleton.*)The jury should have had the benefit of this evidence in its deliberations.

Defendant further contends that the trial court erred in not instructing the jury regarding the justifiable use of force. While he admits that no such instruction was tendered by either party, defendant argues that the court had a duty under the facts of this case to issue a self-defense instruction *sue sponte*. We agree.

■■ In this case the trial court gave a general definitional instruction concerning the crime of aggravated battery, as well as the following issues instruction on the same offense:

> "To sustain the charges of aggravated battery, the State must prove any of the following propositions:
>
> 1. That the defendant knowingly or intentionally caused great bodily harm to Alex Barber, or
>
> 2. That the defendant knowingly or intentionally caused disfigurement to Alex Barber, or
>
> 3. That the defendant knowingly or intentionally caused bodily harm to Alex Barber and that the defendant used a deadly weapon.
>
> If you find from your consideration of all the evidence that any of these propositions has been proven beyond a reasonable doubt, then you should find the defendant guilty.
>
> If, on the other hand, you find from your consideration of all the evidence, that none of these propositions has been proven beyond a reasonable doubt, then you should find the defendant guilty."

Neither instruction addressed the question of the justifiable use of force

by the defendant, nor were instructions tendered in this regard. The general rule is that a trial court is under no duty to give instructions which are not requested by either party, and the failure to object to those instructions given waives any error for purposes of review. (See *People v. Lynch* (1976), 43 Ill. App. 3d 1039, 358 N.E.2d 17.) In this case, however, we consider the defect substantial enough so that the defendant's failure to tender an appropriate instruction does not constitute a waiver. Ill. Rev. Stat. 1977, ch. 110A, par. 451(c); *People v. Wright* (1975), 32 Ill. App. 3d 736, 336 N.E.2d 18.

We find the recent case of *People v. Sunquist* (1977), 55 Ill. App. 3d 263, 370 N.E.2d 864, persuasive in this regard. In *Sunquist*, as in this case, the defendant failed to tender any self-defense instruction. Nonetheless, the court found that, since the defendant's testimony raised the issue of self-defense, it was error not to instruct the jury that the State must prove, in addition to the elements of the crime, that the defendant was not justified in using the force which he used. (Illinois Pattern Jury Instructions, Criminal, No. 25.05.) The *Sunquist* court reasoned that once the defense of self-defense was raised by sufficient evidence, the law requires that at that point it became incumbent upon the State to prove beyond a reasonable doubt that the defendant's act of shooting her husband was not done in justifiable self-defense. (55 Ill. App. 3d 263, 268, 370 N.E.2d 864, 867, citing *People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681.) The court then concluded that:

> "Therefore, because the jury found the defendant guilty of murder without being properly instructed that the State was required to prove beyond a reasonable doubt that the defendant's act was not justifiable self-defense, the judgment must be reversed and this cause remanded for a new trial." 55 Ill. App. 3d 263, 268, 370 N.E.2d 864, 867.

■■ We believe similar reasoning is applicable to the case at bar. We have concluded, as did the court in *Sunquist*, that the defense evidence sufficiently raised the question of whether defendant acted in defense of his person. Thus, the burden shifted to the State to prove beyond a reasonable doubt that this was not a case of self-defense, and the jury should have been so instructed.

> "When an affirmative defense of self-defense is raised as here, the appropriate issue instruction must be given in order that the jury understands that the State must prove beyond a reasonable doubt that the defendant was not justified in using the force which the defendant's evidence claimed was used." *People v. Wright* (1975), 32 Ill. App. 3d 736, 744, 336 N.E.2d 18, 25.

The foregoing errors, without more, clearly require that this cause be remanded for a new trial on the aggravated battery charge. The State

argues in response to a number of defendant's remaining contentions that, even if error occurred, defendant waived such errors for purposes of review by failing to enter a timely objection at trial. Nonetheless, we address the merits of those issues which might recur upon retrial.

■■ Defendant contends that he was denied a fair trial when the State adduced evidence that he failed to inform police following his arrest that he had acted in self-defense. The United States Supreme Court has determined that the post-arrest silence of an accused may not be used for impeachment purposes (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240), and defendant argues that the following exchange during his cross-examination constitutes a *Doyle* violation:

"Q When did you talk to Sergeant Vincent?

A After he padded [*sic*] me down and put me in the car.

Q Did you talk to him inside the car?

A Yes.

Q You didn't tell him anything about Alex Barber swinging a cue stick at you?

A Yes, I did.

MR. KARLIN [defense counsel]: Objection.

THE COURT: It is within the reasonable pervue [*sic*] of cross examination. Overruled.

MR. KARLIN: No man is obliged to testify against himself.

MR. FAKLIS [prosecutor]: Objection to the speech before the jury.

THE COURT: Proceed. What was your answer to that question?

THE WITNESS: Yes, I did tell him.

BY MR. ARTHUR [prosecutor]

Q You did tell about Barber attacking you with a cue stick?

A Yes.

Q So if Sergeant Vincent testified last Friday that you did not, Sergeant Vincent is lying again?

A Absolutely."

This record does not support defendant's allegation that the State adduced testimony concerning post-arrest silence. On the contrary, defendant answered the questions posed by testifying that he had told police that he acted in self-defense. Yet we would comment that the propriety of this line of inquiry under the circumstances of this case is, at best, questionable.

The *Doyle* court commented in a footnote that evidence of post-arrest silence could be used to challenge a defendant's testimony concerning his post-arrest conduct.

"It goes almost without saying that the fact of post-arrest silence

could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. *Cf. United States v. Fairchild*, 505 F.2d 1378, 1383 (CA5 1975)." (426 U.S. 610, 619-20 n.11, 49 L. Ed. 2d 91, 98 n.11, 96 S. Ct. 2240, 2245 n.11.)

However, in this case, upon interjecting this issue into the case and risking a serious *Doyle* violation if defendant responded negatively, the State did not challenge his testimony. No rebuttal witness was called to testify that defendant had not told police that he had acted in self-defense. (See *People v. Johnson* (1976), 42 Ill. App. 3d 194, 355 N.E.2d 577.) Rather, the State merely attempted to impeach defendant's testimony concerning his conduct by posing a "hypothetical" question which had no basis in the evidence. Sergeant Vinson had not testified that the defendant had not told him he was attacked by Barber, and to infer such to the jury was improper. In the absence of proper rebuttal testimony it should not have been suggested to the jury that defendant had failed to assert his claim of self-defense upon his arrest. Thus, while no *Doyle* violation occurred in this case, we fail to see to what proper end or purpose this line of inquiry by the State was aimed.

■■ Defendant next alleges that the State improperly examined his character witnesses regarding their knowledge of the events of the alleged offense. The defense presented two character witnesses who testified that defendant had a good reputation for peacefulness in the community. Both witnesses also testified, without objection, that they were not present in Riddle's Lounge on the day in question and they did not know what happened there. Since no objection was made to this testimony, we do not believe the court erred in its admission; however, for purposes of retrial, we shall comment upon the propriety of such questions.

The first witness, David Clay, testified on direct examination that defendant's reputation for peacefulness was good. On cross-examination the following exchange occurred:

"Q Officer Clay, on April 2, 1976, were you in Riddle's Lounge?
A No, I wasn't.
Q You don't know what happened there?
A No."

These questions were not properly within the scope of cross-examination and were objectionable.

■■■ The rules concerning the cross-examination of character witnesses

were succinctly summarized recently in *People v. Dorn* (1977), 46 Ill. App. 3d 820, 823, 361 N.E.2d 353, 355-56:

> "Where evidence of a person's character is introduced at a trial, such evidence is confined to proof of that person's general reputation. (*People v. Willy* (1921), 301 Ill. 307, 133 N.E. 859.) This general reputation is not established by the personal knowledge of the witness but by what some relevant social group (*e.g.*, people in the community), as a whole, thinks of the person. For that reason, it is improper to cross-examine a character witness as to the witness' own knowledge of particular acts of misconduct on the part of the person whose character is being testified about. (*People v. Greeley* (1958), 14 Ill. 2d 428, 152 N.E.2d 825; *People v. Hermens* (1955), 5 Ill. 2d 277, 125 N.E.2d 500.) Such cross-examination is limited to disparaging rumors and conversations which the witness has heard in the community. *People v. Greeley* (1958), 14 Ill. 2d 428, 152 N.E.2d 825; *People v. Willy* (1921), 301 Ill. 307, 133 N.E. 859."

While the questions in the instant case did not directly ask whether the witness knew of past bad acts by defendant (see *People v. Redmond* (1972), 50 Ill. 2d 313, 278 N.E.2d 766), nor did they ask whether the witness could swear that defendant did not commit the crime with which he was charged (see *People v. Greeley* (1958), 14 Ill. 2d 428, 152 N.E.2d 825), we believe the effect was similar. The witness' knowledge of the instant occurrence was not relevant or material to the question of the defendant's general reputation. The inference to be drawn from this testimony is that since the witness had no knowledge of the April 2, 1976, act of violence by defendant, then the reputation evidence was worthless. Such impeachment was improper. In effect, these questions do not differ significantly from asking whether the reputation witness could testify that defendant had not committed the charged crime. As the court noted in *Greeley*:

> "There certainly was no doubt but what these witnesses were without knowledge as to the facts of the alleged crime; therefore the only effect such interrogation had was to place the defendant at a disadvantage by insinuating matters which the prosecution was legally obligated to prove." 14 Ill. 2d 428, 433, 152 N.E.2d 825, 827.

As to the second character witness, Darrell Neal, he too was asked by the State whether he knew what had occurred on April 2 at Riddle's Lounge. However, in this instance the defense counsel had asked Neal during direct examination whether he had been present on that date in the lounge. Thus, the State's further inquiry in this regard was not objectionable as being beyond the scope of direct examination. Where

the defense has opened up an area on direct examination, it cannot complain if the prosecutor pursues the matter on cross-examination. (*People v. McClaine* (1971), 132 Ill. App. 2d 669, 270 N.E.2d 176.) It is proper for a prosecutor to pursue a line of questioning which is initiated by a defendant. *People v. Briggman* (1974), 21 Ill. App. 3d 747, 316 N.E.2d 121.

Defendant's fifth contention is that the State improperly examined him regarding the credibility of other witnesses, and by posing questions that assumed facts not in evidence. While such testimony again was, for the most part, without objection, we will consider this issue for purposes of the retrial.

■■ During cross-examination defendant was asked a number of times whether those witnesses whose testimony might have conflicted with his were lying. The complained-of exchanges follow:

"Q When Sergeant Vincent came up to you you were out in the parking lot, outside his car and you talked to him, didn't you?

A No.

Q So when Sergeant Vincent testified the other day that he did talk to you outside that car, he was lying, is that correct?

A Yes, he was.

Q You did tell him about Barber attacking you with a cue stick?

A Yes.

Q So if Sgt. Vincent testified last Friday that you did not, Sgt. Vincent is lying again?

A Absolutely.

* * *

Q How many times did you fire the gun?

A Twice.

Q Now, you heard Alex Barber testify last week, did you not?

A Yes.

Q You heard Alex Barber testify that you shot at him twice inside the tavern and you shot at him again outside. Did you hear that? Yes or no? Did you hear Alex Barber testify to that?

A Yes.

Q Alex Barber must have been lying, right?

MR. KARLIN [defense counsel]: Objection. The person may be mistaken.

THE COURT: It's possible. Proceed.

BY MR. ARTHUR [prosecutor]:

Q Yes or no?

A Yes he was lying.

Q Now you also heard Alex Smoot testify last week?

A He is lying too."

These questions clearly invaded the province of the jury to determine which witnesses, whose testimony conflicts, are telling the truth. (See *People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450.) It is improper to ask a defendant's opinion concerning the veracity of other witnesses. (See *People v. Castillo* (1976), 40 Ill. App. 3d 413, 352 N.E.2d 340; *People v. Meeks* (1973), 11 Ill. App. 3d 973, 297 N.E.2d 705, *cert. denied* (1974), 418 U.S. 905, 41 L. Ed. 2d 1153, 94 S. Ct. 3195; *People v. Hicks.*) In view of our disposition in this case we need not consider the State's argument that such errors were merely harmless.

■■ Defendant was also cross-examined concerning the medical testimony of Dr. Davila.

"Q And you heard Dr. De Villa testify that the bullet traveled in a downward direction?

A No, I did not.

Q But, if you are down on your knees and Alex Barber, who is a pretty good sized man, is standing and you fire the shot without looking, that bullet would not travel downward, would it?

MR. KARLIN [defense counsel]: That is not the way he said it.

BY MR. ARTHUR [prosecutor]:

Q Would it?

A I do not know. I don't have the direction of the bullets."

The record reveals nothing in the testimony of Dr. Davila which indicated the direction traveled by the bullet which struck Barber. It was improper for the State to so insinuate to the jury without producing the supporting evidence. See *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353.

Lastly, defendant argues that he was not proved guilty beyond a reasonable doubt. We need not discuss this issue at length. There was testimony in the record which, if believed by the jury, was sufficient to convict defendant. However, we have determined that the record was not free of prejudicial error, and thus defendant was denied a fair trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and this cause is remanded for a new trial on the charge of aggravated battery.

Reversed and remanded.

SULLIVAN, P. J., and WILSON, J., concur.