(No. 16222.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES ST. LUCIA, Plaintiff in Error.

*Opinion filed December 16, 1924—Rehearing denied Feb. 6, 1925.*

1. CRIMINAL LAW—*when a clause in an instruction as to self-defense is not applicable.* In a prosecution for murder, where there is no evidence of any fight or struggle between the defendant and the man he claims to have killed in self-defense, an instruction that the defendant cannot avail himself of that defense unless it appears that he had "in good faith endeavored to decline any further struggle before the mortal wound was inflicted" is not applicable to the case but is not necessarily prejudicial.

2. SAME—*when clause as to who was aggressor is proper in instruction as to self-defense.* In a prosecution for murder, where the defendant claims to have fired the fatal shot in self-defense, the People are entitled to have included in an instruction as to when such defense may be availed of, the proposition that it must appear that the deceased was the assailant, where the evidence for the People is that the defendant, and not the deceased, was the aggressor.

3. SAME—*instructions should not include propositions not applicable to the case.* Instructions should not include propositions not applicable to the case, as they tend to mislead the jury to the prejudice of the defendant and sometimes necessitate a reversal.

4. SAME—*when People are entitled to an instruction as to self-defense based on their theory of case.* In a prosecution for murder, where self-defense is set up and the evidence for the People tends to show that the defendant was the attacking party, the jury may be instructed that the law of self-defense does not give the defendant the right of attack in the first instance or permit retaliation or revenge, as the People are entitled to have instructions on their theory of the case in so far as there is evidence in the record to support it.

5. SAME—*murder is a capital offense regardless of punishment—act of 1917.* Murder is a capital offense under the constitution and statute, in which the defendant is not entitled to bail whether the judgment be imprisonment or hanging, and the act of June 25, 1917, (Laws of 1917, p. 338,) providing for bail when application is made for *supersedeas,* does not apply.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE FRED RUSH, Judge, presiding.

CHARLES F. ERBSTEIN, and JOHN B. FRUCHTL, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, CLYDE C. FISHER, and HENRY T. CHACE, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county of the murder of Vincenzo Fiallo and sentenced to the penitentiary for the period of his natural life. He brings the cause here for review, and argues that the verdict is contrary to the weight of the evidence and that the court erred in giving and refusing instructions.

The homicide occurred on the 28th of April, 1924, in Melrose Park, in Cook county. Plaintiff in error and the deceased lived on Twenty-second avenue, in Melrose Park. This avenue runs north and south. Plaintiff in error's residence was at No. 134 Twenty-second avenue. The deceased lived at No. 120. Between the houses of the two was a vacant lot owned by the deceased. Plaintiff in error had two houses on his lot,—one in the front and one in the rear. Each was so arranged as to accommodate two families. Fiallo's house and vacant lot lay on the north side of plaintiff in error's property. The deceased had commenced to build a fence on the south side of the vacant lot next to the property of plaintiff in error. It appears that the fence building had gone on at intervals for a number of months. At the time of the homicide Fiallo was extending the fence past the house on the rear of plaintiff in error's lot. This building was occupied by Angelo Nunci-

atto and Martha, his wife, who lived on the second floor, and by Sam Spirando and Francesca, his wife, who lived on the first floor. The evidence shows the deceased was working on the fence just beneath the pantry window of the Spirando apartment and that the shot was fired from that window. The deceased and plaintiff in error had been quarreling for some time about this fence, the latter contending that the fence was over on his line and also objecting to the character of the fence, which he contended was not uniform and was so high as to shut out the light from the windows of the Spirando apartment. Plaintiff in error does not deny the shooting but contends that he did shoot in justifiable self-defense.

The State's evidence as to the shooting is contained in the testimony of John Merzulo, a nephew of the deceased, who lived with the latter on the day of the shooting. He was the only witness to the shooting. He testified that he arrived at home about ten minutes after five on this afternoon; that he started to prepare his evening meal while his uncle was working on the fence next to plaintiff in error's property; that he heard plaintiff in error apply to the deceased a vile epithet, and upon hearing this he looked out of the window near him and saw plaintiff in error point a revolver out of the pantry window and shoot the deceased; that at the time of the shot the deceased was near the fence; that witness then went out and picked up his uncle from the sidewalk and helped him into the house. He testified that the deceased had no fire-arms in his possession at the time. He also testified that his uncle was about four feet from the window when he was shot. The evidence shows that the pantry window from which planitiff in error fired the shot is about eight or ten feet from the ground. The window is two and a half feet wide.

The medical testimony showed that the bullet entered the left cheek, over the prominent part of the cheek bone, and took a course downward through the cheek, left jaw

bone, through the soft tissues at the back of the mouth and into the second vertebra of the neck, on the left side. The bullet was taken from the deceased during the post-mortem examination.

Sam Fiallo, a son of the deceased, testified that on May 4, at about eight or nine o'clock P. M., he had a conversation with his father at the Oak Park Hospital; that his father called him to his bedside and said: "Son, I have not very long to go now; just come to my bedside; I want to tell you everything." His father then stated: "Son, you know the children of Jim St. Lucia they always came into the garden, threw cans and rubbish in there and tramped all over my garden, and I thought one way to avoid it was to put up that fence. I have warned Jim St. Lucia's children to keep away, but it seems the children were always in there, so that was the only way out of it and that was to build a fence to avoid trouble. So I started to build the fence. 'Then St. Lucia came to me and said, 'You are building this fence on my property.' Then I said, 'I am absolutely sure this fence is being built on my property because I measured it, but if you have any doubt, call the law and have them decide.' Then I went ahead and worked on the fence and had two or three boards nailed, and when I was upon my knees and bending down and nailing the bottom board I heard a window raised up above me. I looked up and there was St. Lucia, and as I looked up he fired point blank at me, and he is the man that killed me." Witness further testified that shortly after making this statement his father became unconscious and that he died the next morning, about eight o'clock. This statement was admitted as a dying declaration of the deceased.

Charles Kolwitz, a police officer, testified that he went to the home of the deceased shortly after the shooting, and after making inquiry as to who shot him, placed plaintiff in error under arrest; that after taking him to the station he returned and found a pistol in his room; that the gun bore

marks of having been recently discharged; that upon look-
ing around Fiallo's yard he found there were three boards
knocked off the fence near the rear house of plaintiff in
error. On these boards were stains of blood. The boards
were lying on the ground, with the nails sticking up. He
testified, on cross-examination, that he searched Fiallo's
house several days after the shooting and that he saw a re-
volver on a table near a bed; that he made no search of
the house on the day of the shooting, and that he saw no
weapon in Fiallo's possession at that time and that he saw
none in the house on that day.

Joseph Januski, a police officer, testified that he arrived
at the scene of the shooting shortly after officer Kolwitz;
that he went with the latter and placed plaintiff in error un-
der arrest; that they returned to Fiallo's house and looked
around but did not make a thorough search, and that they
saw no gun.

Plaintiff in error took the stand and admitted that he
fired the shot from the pantry window. He testified that
the fence being built by the deceased was constructed in such
a way as to shut out the light from the lower apartment of
plaintiff in error's building on the rear of his lot; that he
complained to the deceased, who replied that he had a right
to put up a fence on his own property in any way he wanted
to; that if the plaintiff in error kept on talking, he, the de-
ceased, would cover up the windows up-stairs; that about
a week before the date of the shooting the deceased was
extending the fence toward the rear of the two lots; that
it was being built on plaintiff in error's side of the division
line; that he complained to the deceased that the fence was
over the line, and that if he didn't remove it plaintiff in
error would have to go to court to require him to; that
the deceased said, "You nor nobody else can make me move
it. Do you see this? This is my protection," and with that
he showed the butt end of a revolver in his pocket; that
on the day of the shooting plaintiff in error, with one of

his tenants, Angelo Nunciatto, was painting the house on the front of his lot, and having completed that work about five o'clock in the afternoon he changed his clothing and went to the building on the rear of the lot with a ruler, for the purpose of measuring the distance from the fence being built by the deceased to plaintiff in error's house; that he went into the pantry immediately over the place where the deceased was working and with a ruler measured the distance of the fence from the building; that he found the fence was running nearer to the building as it progressed; that he said, "Mr. Fiallo, what business have you to put a fence on my property?" that the deceased said, "The fence ain't on your property;" that plaintiff in error replied, "Here is a rule; come and look at it yourself;" that the deceased refused to do so, and plaintiff in error then declared that he would go into the court to force the correction of the fence; that the deceased then called him a vile name, and said, "I will kill you before I move that fence," and came toward plaintiff in error with his hand on his hip pocket; that at that instant plaintiff in error saw Merzulo, nephew of the deceased, coming out of the house shouting to his uncle "to kill that animal;" that the nephew had a revolver in his hand; that plaintiff in error feared he would be shot and that he fired upon the deceased in self-defense.

Martha Nunciatto, wife of Angelo, who lived in the upper flat in the rear property, testified that on the afternoon of the shooting she heard an argument which she did not understand because it was in Italian; that she did not know who was talking but that she did hear the deceased curse; that she looked out of the window and saw him coming toward the house with his hand toward his hip; that she was up-stairs and did not see plaintiff in error; that the deceased was about four or five feet from the pantry window on the first floor, which was directly below the window out of which she was looking; that she turned

away from the window and started out of the room; that at about the time she got to the door she heard a shot; that she did not see or hear anything else.

Angelo Nunciatto testified that after he and plaintiff in error had quit painting on the day of the homicide he happened to go into the pantry in the apartment below the one in which he lived and that he saw plaintiff in error there arguing with the deceased about the fence; that plaintiff in error had a shot-gun in his hand; that witness took it away from him and put it outside the pantry door; that the argument did not concern him and he walked out of the pantry, and as he went out he heard a shot; that he then went outside onto the porch of the first floor of the building and saw Merzulo, nephew of the deceased, with a gun; that Merzulo picked up the deceased. He testified that before he heard the shot he had seen Fiallo in the vacant lot about ten feet from the fence; that he didn't see anybody else there at that time; that when he saw Merzulo he was coming toward plaintiff in error's house, about twenty-five feet from it, on the vacant lot.

Francesca Spirando, a tenant living in the lower flat on the rear of plaintiff in error's lot, testified that the shot-gun which plaintiff in error had in the pantry belonged to her husband and that it was not loaded. She also testified, in contradiction of Nunciatto, that after the shot was fired she called to him; that at that time he was down in the basement of the building and that he afterward came out of the basement.

This, aside from testimony of numerous witnesses concerning the good reputation of both the deceased and plaintiff in error as peaceful and law-abiding citizens, was the testimony in the record.

Plaintiff in error as to his defense of self-defense is corroborated by Martha Nunciatto, who says that she saw Fiallo approaching the house with his hand on his hip, and by Angelo Nunciatto, who states that after the shooting he

saw Merzulo, the nephew of the deceased, with a gun in his hand. Angelo's testimony, however, is substantially weakened by the testimony of Francesca Spirando that he came out of the basement of the house after the shot was fired. If her testimony is true, he, of course, could not have been in or near the pantry on the first floor of the building at the time the shot was fired. Plaintiff in error is contradicted directly by the testimony of the nephew of the deceased, who, according to all of the evidence in the case, was the only eye-witness to the shooting. Plaintiff in error's story is further contradicted by the evidence that the deceased had no gun in his possession at the time of the shooting and the evidence of the direction from which the shot was fired. That evidence tends to corroborate the dying declaration of the deceased that it was fired from almost above him. Evidently, from the statement of Merzulo that the deceased fell after the shot, he was standing almost directly under the window when plaintiff in error fired, the bullet entering the upper part of the cheek and taking a downward course through the jaw bone into the soft flesh of the throat and imbedding itself in the second vertebra of the neck.

Whether or not plaintiff in error shot in self-defense is a controverted question of fact. No one saw the deceased have a gun and plaintiff in error says only that he had his hand on his hip. Plaintiff in error is the only one who testifies to seeing the nephew come out of Fiallo's house before the shooting. Plaintiff in error was in the window of a pantry eight or ten feet above the ground, and does not even contend that he might not have withdrawn from the window to a place of safety. The question as to how the shooting occurred was one of fact and therefore particularly within the province of the jury to decide. The evidence was, however, conflicting, and plaintiff in error was entitled to have the jury accurately instructed. The

seventh instruction offered on behalf of the People is objected to. That instruction is as follows:

"The court instructs the jury as a matter of law, that before a defendant can avail himself of the right of self-defense, it must appear that at the time of the killing the danger was apparently so urgent and pressing, that in order to save his own life or to prevent his receiving great bodily harm, the killing was absolutely necessary or apparently necessary and it must also appear that the person killed was the first assailant, or that the defendant had really and in good faith endeavored to decline any further struggle before the mortal wound was inflicted."

On this branch of the case plaintiff in error offered, and the court gave, the following instruction:

"The court instructs the jury as a matter of law, that where a person is in a place where he has a lawful right to be, and is put in apparent danger of his life or great bodily harm, he need not attempt to escape, but may lawfully stand his ground and meet force with force even to the taking of his assailant's life, if necessary, or apparently necessary to save his own life or to prevent great bodily harm."

One objection is that the State's instruction No. 7 is in direct contradiction of defendant's instruction No. 10 by reason of the latter clause in instruction No. 7, "or that the defendant had really and in good faith endeavored to decline any further struggle before the mortal wound was inflicted." These instructions are both abstract propositions of law. The quoted clause objected to was not applicable to this case, as the evidence discloses there had been no struggle between the plaintiff in error and the deceased, and though correct when given in a case where the accused and the deceased had been engaged in a fight or struggle preceding the time of the shooting, it had no application here.

Plaintiff in error cites the cases of *Flynn* v. *People,* 222 Ill. 303, *Filippo* v. *People,* 224 id. 212, and *Foglia* v. *Peo-*

*ple,* 229 id. 286, as authority for his contention that the
clause of the instruction objected to is not only inapplicable
but prejudicial.   In the *Flynn case* the language objected
to was, "and it must also appear that the person assaulted
by the defendant was the assailant,—*that is,* that the de-
fendant had really and in good faith endeavored to decline
any further struggle before such assault was made by him,"
etc.   It will be seen upon comparing the two instructions
that the one in the *Flynn case* required both the element of
endeavor to decline further struggle and that the person
assaulted by the defendant was the assailant, before the
defense of self-defense would be available.   The two in-
structions differ in that the one in the instant case makes
it necessary that it appear that the person killed was the
first assailant *or* that the defendant had endeavored to de-
cline further struggle.   The evidence of the State was that
the plaintiff in error, and not the deceased, was the ag-
gressor.   The State was therefore entitled to that portion
of the instruction to the effect that it must appear that de-
ceased was the first assailant.   (*People* v. *Capello,* 282 Ill.
542.)   Plaintiff in error's testimony was to the effect that
the deceased was the first assailant.   The jury determined
that issue of fact against the testimony of plaintiff in er-
ror.   While the clause as to an endeavor in good faith to
decline further struggle had no application, we are unable
to see wherein it has prejudiced plaintiff in error.   If the
jury had believed the deceased was the first assailant, then
under this instruction the defense of self-defense was avail-
able without regard to the question whether there had or
had not been an encounter previous to the shooting.   If
the jury believed that the defendant and not the deceased
was the first assailant it was their duty to find plaintiff in
error guilty unless he had declined further struggle before
the shot was fired.   In the *Filippo* and *Foglia cases* the lan-
guage objected to was the same as in the *Flynn case* and
therefore is to be distinguished from the language in the

instruction in the case at bar. It is not good practice to include in instructions propositions of law not applicable, and it many times results in misleading the jury to the prejudice of the defendant, thereby constituting reversible error. We are of the opinion, however, that in this case the language complained of did not result in prejudice to plaintiff in error.

It is urged that there is a more serious objection to this instruction, in that it told the jury "that before a defendant can avail himself of the right of self-defense, it must appear that at the time of the killing," etc.; that such language does not tell the jury to whom such must appear,—whether to the plaintiff in error or to the jury; that this language is not a correct statement of the law and was likely to mislead the jurors to believe that they were the ones to decide whether the shooting was apparently necessary in self-defense, and that the question for the jury to determine was not whether it appeared to them that the acts of plaintiff in error were necessary, but whether it appeared to the defendant, under the circumstances in which he was placed and acting as a reasonable person, that he was in danger of receiving great bodily harm. We do not believe, however, that the jury were misled in this case. The court, at the instance of plaintiff in error, gave eight instructions on the law of self-defense which covered this and other phases of such defense. Plaintiff in error's third instruction told the jury that the defendant should not be held guilty for the shooting if the jury found from the evidence that he believed from the surrounding circumstances that the danger to him was real. His sixth instruction told the jury that the real test in such a case is whether the defendant's fear of death or great bodily harm was reasonable under the circumstances.

Instruction No. 6 is complained of. This instruction told the jury that the law of self-defense does not give to the defendant the right of attack in the first instance or

permit retaliation or revenge. The jury were told that if they believe, beyond a reasonable doubt, that the defendant sought or brought on the difficulty with the deceased at the time of the shooting, or that at the time he shot he had no reasonable cause to apprehend an immediate injury to himself but acted in a spirit of disregard of human life or from a motive of revenge, he was not entitled to avail himself of the law of self-defense. The objection to this instruction is that there was no evidence that plaintiff in error was the attacking party or that the shooting was done in retaliation or for revenge. The State's evidence tended to show that he was the attacking party and afforded sufficient basis for the instruction. The People were entitled to have instructions on their theory of the case in so far as there was evidence in the record to support it.

The giving and refusing of other instructions is likewise complained of, but in so far as refused instructions presented proper questions of law they were covered by other instructions given.

Plaintiff in error seeks to bring here the question of the refusal of the court to admit him to bail after the verdict of the jury. Murder is a capital offense under the constitution and the statute, whether judgment be imprisonment or hanging, and is a case in which the defendant is not entitled to bail. The act of June 25, 1917, (Laws of 1917, p. 338,) providing that a defendant convicted of a criminal offense which under the law is bailable is entitled to a reasonable time in which to make application for *supersedeas* and is entitled to bail in the meantime, does not apply to capital cases.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*