THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LOUIS WHITE, a/k/a Ricardo Hardin, Defendant-Appellant.

First District (6th Division)   No. 1—92—1386

Opinion filed July 15, 1994.

Rita Fry, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Susan Wigoda, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:
The defendant, Louis White, was convicted by a jury of the first-degree murder of Maurice Polk in a White Castle restaurant parking lot in Chicago on May 25, 1988. He was sentenced to 60 years' imprisonment. No issue is made of the sufficiency of the evidence.

Elijah Rice was at the White Castle parking lot in the car of his brother James at 1:30 a.m. Also in the car were James, Tracey Danforth and Maurice Polk. Friends of Elijah's, Ray Allen and Glenn Polk, the decedent's brother, were in another car parked near the drive-thru in the parking lot.

At the White Castle, James ordered food in two separate orders at the drive-thru window. Due to some confusion with the food orders, the employee told him to proceed to the window to order. After James' car pulled to the window, Glenn Polk came to James' car "trying to get some money for some food." Ray Allen remained in his car in the lot. Maurice Polk and Tracey Danforth went inside to pick up the food order.

Glenn Polk called Elijah's attention to a person standing by a window displaying a "pitchfork" gang sign. James "threw up a gang sign" from the car in which he was sitting. The person inside the White Castle walked toward James' car door. James went to the trunk of his car and retrieved a tire jack. He went to the entrance of the White Castle, but Maurice Polk, who was on his way back to the car, told James not to start anything and to leave it alone. James returned to the car and threw the jack in the trunk.

James entered the car through the driver's side door. Maurice Polk, Tracey Danforth and Elijah proceeded to the passenger's side. Maurice and Tracey were carrying bags of food. They were standing in the car doorway when three men came around the corner of the building on the Jeffrey Street side. They stood about seven feet from James. At that point, a man identified by Elijah as the defendant "pulled out a gun and pointed it at the car and shot." The man was about three to four feet away from the car and was to the left of the car. He stood on the sidewalk when he fired. James, Elijah and Tracey Danforth all testified that before the first shot was fired Maurice Polk was standing by the passenger side of the front seat. The door on that side was open. Danforth testified that Polk was telling her to get into the car. After the shot was fired, James drove off and travelled around the corner, and as he pulled away, Elijah heard three more shots. Elijah saw the defendant "running in the back of the White Castle." When James drove away Elijah and Tracey started running away. When the car pulled away, Elijah saw that Maurice Polk had fallen onto the pavement. Elijah saw the men run up to the railroad tracks and down the tracks.

Aristides Vera was working at the White Castle. He worked at the first drive-thru window; a car pulled up and placed an order; the order got mixed up; and the car pulled forward facing the 95th Street end of the building. Someone left the car to pay for the order. Before

the order was completed, he heard arguing from inside the White Castle; the arguing continued outside the building.

He looked outside and saw the trunk of the car being opened. The driver of the car pulled out a jack "or something." The group inside the White Castle stepped toward the 95th Street exit and then ran back inside through the Jeffrey Street exit. He heard one of the group say, "[D]on't worry, don't worry, you got it, you got it." The group left through the Jeffrey Street exit. He saw the passenger, who was later identified by other witnesses as Maurice Polk, getting ready to "jump in" the car when he heard gunshots from the drive-thru area near 95th Street. He did not identify anyone.

Detective Gerald McGovern, who was assigned to investigate the killing of Maurice Polk, learned that "Nooky" was the defendant's nickname. He had known about the defendant in 1988 and made many attempts to locate the defendant at several addresses. He told the defendant's mother that the police were looking for him in connection with the shooting at the White Castle, but the defendant never came to the station. He recalled that he saw a tire jack without the handle near the 95th Street exit at the scene. He examined James Rice's car and trunk, which contained a spare tire, tire jack and tire iron. The tire jack found in the White Castle was processed and no fingerprints were found on it.

Officer John Franklin arrested the defendant on June 5, 1989. On that date, he received a description of a black male wearing a blue baseball jacket with the letters "G" and "D" cut into his hair. The arrest Franklin made was on a charge unrelated to the killing of Polk; the charge was not disclosed to the jury.

Nancy Jones, the medical examiner, testified that Polk died as a result of a gunshot wound to the head. The bullet entered slightly above and slightly behind the victim's right ear. The bullet travelled nearly completely across the head in a fairly straight path to the mid-portion of the left side of the head. She said that the bullet, which was recovered from Polk's head, was a "non-deformed or a non-ricochet bullet."

The defendant testified that he was 18 years old on May 25, 1988, and had been a gang member for about eight years. Before 1 a.m., he left his girlfriend's house and walked to the White Castle. On the way he met Marvin McFerrin and Rodney Brazelton. They gave him a ride to White Castle.

When they arrived at the White Castle around 1 a.m., Marvin parked the car, and the defendant went into the restaurant with Rodney to order food. Marvin went to use a nearby pay telephone. After the defendant ordered, he stepped over to the window and waited for his order. He was "just looking out the window" when he

noticed a "young man" walking toward him. The young man wore a baseball cap, which he had turned "to the left-hand side of his head." That gesture meant that the young man was a Vice Lord gang member. The defendant did not consider that a hostile act.

He saw a red car approach the window and saw four occupants in the car, but he did not know them. The driver of the car said something to him and threw up both hands; that gesture was a gang sign of the Vice Lords. The defendant responded by throwing up his gang sign, a Disciple's pitchfork. He denied that this was a hostile act among gang members. The other young man said "hostile things" to the defendant; the defendant heard "curse words." He knew the other young man was "mad" because he had an "angry face." The driver of the car went to his trunk. The defendant moved away from the window toward the counter where Marvin and Rodney stood; he wanted to alert them that "it looked like it was about to be some trouble."

He was armed with a handgun when he entered the restaurant; the gun was in the front of his pants. Two or three men came into the restaurant and at least two of them had weapons; one had a crowbar and another had a tire jack. He knew that they came from the red car. The defendant, Rodney and Marvin went outside.

The defendant stood on the black pavement, not the sidewalk as the State witnesses had testified. He saw the three men with three or four others standing in a little crowd outside. They invited him, Marvin and Rodney to a "jumble or something. Like a fight." He "tried to ignore them" but they "would not go away." Instead, the group became "aggressive," calling out their "names *** and [stating] what they're going to do to us. *** Beat us up." The driver of the car told the defendant that "if [he] kept standing where [he] was standing that he was going to run [him] down." The driver opened his car door; the motor was running. The defendant thought that the driver was going to try to run over him. The defendant "extended the gun from [his] trousers *** [and] held it down to the side." When he brought the gun out, he thought he was going to scare the other man. The young lady with the other men was scared; she was trying to tell the other man to leave it alone. The driver was "like kind of hostile toward her pushing her away telling her she was scared and just get away." The defendant saw the driver get into the car and close the door. The car went into drive and was coming toward the defendant. The defendant "aimed the gun and fired toward the car *** a little above the windshield." After he fired he ran toward the railroad tracks because the "car was coming at full speed." He thought the car was going to run over him. As he ran, he fired two

more shots and went over the tracks. He did not learn that anyone had been shot until 1989.

He remained a gang member until 1989. He identified the photograph taken of him on the day of his arrest which shows his hairstyle. The letters "G" and "D" that were cut into his hair represented "growth" and "development"; the letters did not mean that he was a Gangster Disciple. The star of David cut into the back of his hair represented the Black Gangster Disciples. On cross-examination he testified that he fired the gun as soon as the car began to move; he aimed "at a little over the driver." After he reached 95th Street he threw the gun away while he ran over the railroad tracks. When he finally returned home in 1989, his mother told him that the police were looking for him.

Ernest Carter, the security guard on duty at the White Castle, testified in rebuttal. At about 1:45 a.m. there were about three people standing in the customer area; two of them were standing in the window. The "shorter, stocky" man was "throwing gang signs" through the window. Two of them went outside through the 95th Street door; he saw a red car parked outside. The driver of the car went to the trunk, and the two men who had gone outside ran back to get the third man. The tallest man pulled out a revolver as he ran out the exit; he identified the tallest man as the defendant. As the defendant and the others left, the shorter man yelled, "Shoot him, shoot him. Give me the gun."

According to Carter, after the defendant left the restaurant, he stood about 10 feet east of the doorway. He "pointed the gun and held it in combat style and started firing." He shot the gun twice. After the second shot, the car drove off while the defendant stood on the sidewalk. When the car was fired upon, it faced 95th Street; it had not moved until the shots were fired.

The defendant first contends that the trial judge erred in refusing to instruct the jury on the offense of involuntary manslaughter. The trial judge, in refusing the involuntary manslaughter instruction, did say that the defendant was entitled to a second-degree murder instruction and that instruction was given.

Murder and involuntary manslaughter are distinguished by their mental states: murder requires an intent to kill or do great bodily harm or knowledge that the acts create a strong probability of such a result, while involuntary manslaughter requires only reckless conduct which causes death. (See *People v. Maldonado* (1992), 240 Ill. App. 3d 470, 608 N.E.2d 499.) Where a defendant is charged with murder, an involuntary manslaughter instruction is required "only in cases where the jury could rationally find the defendant guilty of [involuntary manslaughter] and not guilty of [murder]." *People v.*

*Perez* (1985), 108 Ill. 2d 70, 81, 483 N.E.2d 250, 255. In *People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696, 699, the supreme court said *"credible evidence* in the record which would reduce murder to manslaughter entitles an accused to a manslaughter instruction." (Emphasis added.) The issue, therefore, is whether there is credible evidence in the record that would permit the jury to rationally find the defendant guilty of involuntary manslaughter.

●1 The defendant relies on his testimony that he aimed the gun and fired at the car "a little above the driver" in an attempt to scare the driver. He argues that even though multiple shots were fired, the jury could still have found that the shooting of Maurice Polk was an unintended result of the defendant's reckless firing of his gun. He maintains that the jury could have found that Louis aimed at Rice's car, hit the car and the bullet ricocheted and struck Maurice Polk. The defendant's claim that the bullet that killed Polk could have been a ricochet contradicts the argument his attorney made to the jury: "It's absolutely clear from the medical examiner's testimony it wasn't a ricochet." That statement is a correct interpretation of the medical examiner's testimony. The issue is reduced to this: If the jury believed that the defendant aimed the gun slightly above the driver's head, could it have *rationally* found that he was guilty of involuntary manslaughter and not guilty of murder? We judge that the jury could not rationally have so found. First, the defendant's theory and his testimony are at odds with the undisputed physical evidence as the State's Attorney properly argued to the jury. The defendant's attorney impliedly conceded that it was physically impossible for Polk to have been struck by a bullet fired by the defendant in the manner to which the defendant testified. He abandoned the argument that the bullet ricocheted and struck Polk; instead he argued that Polk was struck by a bullet from someone else's gun.

All the physical evidence, including the blood spot which indicated where Polk fell, leaves no other conclusion but that James' car was facing south toward 95th Street, not east as the defendant testified. The pictures of the car's windshield show that the bullet entered the windshield within an inch of the extreme end of the windshield on the driver's side and slightly above the middle of the windshield. Polk was getting into the passenger side of the car. It is absolutely certain, therefore, that the bullet that struck Polk was fired from an angle slightly off a line which would be almost parallel to the windshield. According to the defendant's testimony, any bullet fired from his gun would have travelled in a path almost perpendicular to the windshield.

Second, even if we assumed that the defendant had established that he fired at an angle perpendicular to the windshield, we would

still hold that he was not entitled to an involuntary manslaughter instruction. Both the defendant and the State have cited several cases, all of which vary factually from this case to some degree, but we believe one case is strongly similar to the case before us and supports the State's position.

In *People v. Cannon* (1988), 176 Ill. App. 3d 49, 530 N.E.2d 1035, the defendant, a Disciple's gang member and his two fellow gang members went to "get even with some boys that shot" one of the defendant's fellow gang members during the day. While at a residential building, someone started shooting at the defendant and his companions. They ran, and the defendant turned and fired three shots at the building because "[t]hat is where the shots were coming from." (*Cannon*, 176 Ill. App. 3d at 52.) A bystander on the second-floor landing was killed.

The defendant argued that the trial judge erred in not giving an involuntary manslaughter instruction. The appellate court rejected that argument thus:

"In the instant case, the evidence shows that the defendant intentionally and deliberately aimed and fired shots at the 2051 West Lake Street building, which he knew was a residential building. When a defendant voluntarily and wilfully commits an act which has a natural tendency to cause death or great bodily harm, an involuntary manslaughter instruction is not warranted. *People v. Cannon* (1971), 49 Ill. 2d 162, 273 N.E.2d 829." 176 Ill. App. 3d at 55.

In the supreme court case cited in the appellate court case, also *People v. Cannon*, the defendant and others approached a group of boys in a playground. A conversation took place in which the boys in the playground were asked if they wished to join the defendant's gang. When two of them said they did not, they were shot by the defendant. The defendant testified that one of the boys in the group had picked up a baseball bat and along with others started after the defendant and his companions. The defendant "pulled the gun and shot three or four times in their general direction." (*Cannon*, 49 Ill. 2d at 165.) He denied that he shot and killed the two victims intentionally or that he knew such conduct created a strong probability of death without lawful justification.

He argued that the court erred in refusing to give an instruction on involuntary manslaughter. The supreme court said this:

"Cannon's testimony that he did not intend to kill anyone does not provide a sufficient basis for instructing on involuntary manslaughter. He intended to fire the gun and did in fact point it and shoot in the decedent's general direction. This act, done volunta-

rily and wilfully, is sufficient evidence of the intent requisite to constitute the offense of murder. [Citation.]" (49 Ill. 2d at 166.) So also in this case, the defendant intended to fire the gun, pointed it and shot in the general direction of Polk. We conclude, therefore, that the trial judge properly refused to instruct the jury on involuntary manslaughter.

The defendant next contends that his trial attorney was ineffective in two instances: His attorney failed to request an instruction that a nonaggressor does not have a duty to retreat, and he failed to object during the prosecutor's closing argument. His first claim of ineffective assistance stems from the prosecutor's cross-examination of the defendant. The prosecutor repeatedly asked the defendant about his testimony that he was "scared" when he thought the car might approach him, and if he ran off the street or sought help from the security guard or ran to telephone 911 or asked an employee for help. To each of the questions, the defendant replied, "No." The prosecutor finally asked, "Had you just stood there?" and the defendant replied, "Yes, sir."

●2 We judge that the defendant's claim must be rejected for two reasons. First, it is clear that the prosecutor's questions were designed to show that the defendant was not telling the truth when he said that he was "scared" and, as a result, fired the shots. The questions were not intended to imply that legally the defendant was *required* to retreat.

Second, the defendant has not convinced us that such an instruction is proper. The defendant has not proffered what instruction he maintains should have been given. We will assume it would be an instruction couched in the language of the case cited by the defendant, *People v. Smith* (1949), 404 Ill. 350, 88 N.E.2d 834:

> "If one who is not the first assailant is in a place where he has a lawful right to be and is put in apparent danger of his life or of suffering great bodily harm, he need not attempt to escape but may lawfully stand his ground and meet force with force even to the taking of his assailant's life." *Smith*, 404 Ill. at 354.

It is true that similar instructions were sometimes given before the pattern instructions were adopted. (See, *e.g.*, *People v. St. Lucia* (1924), 315 Ill. 258, 146 N.E. 183.) But we are unaware of any case which has upheld a similar instruction since the adoption of the pattern instructions. The only case our research has disclosed in which a similar claim was made is *People v. Conley* (1971), 3 Ill. App. 3d 75, 278 N.E.2d 806. In that case the defendant was convicted of voluntary manslaughter and alleged on appeal that error occurred when the trial judge refused to give the following instruction:

"You are instructed that when a defendant charged with homicide is where he has a lawful right to be, he has a right to stand his ground, and, if he is reasonably apprehensive of injury, he is justified in taking his assailant's life." (3 Ill. App. 3d at 80.)

The appellate court held as follows:

"This contention has no merit. The appropriate I.P.I. instruction concerning self-defense was given by the trial court in compliance with the Illinois Supreme Court Rules. (Ill. Rev. Stat. 1969, ch. 110A, par. 451(a).) Further, defendant's tendered instruction is a gross misstatement of the law of Illinois concerning self-defense. (See Ill. Rev. Stat. 1969, ch. 38, par. 7—1.) There was no error in refusing to give that instruction." 3 Ill. App. 3d at 80.

We agree with the defendant that it has long been the law in Illinois that a person who is not the initial aggressor has no duty to retreat. In that regard Illinois stands with the majority of all other States. But we think it significant that the drafters of the Illinois Pattern Instructions (IPI) in criminal cases have seen fit to omit any instruction similar to that suggested by the defendant in the pattern self-defense instructions.

In the defendant's brief he says, "[A]n instruction telling the jury that Mr. White had *no* duty to retreat would have undercut the prosecutor's argument. Instead, the jury was *never* told that Louis White could lawfully stand his ground." (Emphasis in original.) We note that the language, "could lawfully stand his ground," was almost the same language which was part of the instruction condemned in *People v. Conley,* "has a right to stand his ground." 3 Ill. App. 3d at 80.

●3 The defendant also maintains that his counsel was ineffective for failure to object to the prosecutor's argument which referred to the cross-examination of the defendant about his failure to get out of the street, to ask the security guard for help or to take any other evasive action. We judge that the argument was primarily addressed to the credibility of the defendant, and was not an argument designed to imply that the defendant had a legal duty to retreat. We agree with the State that the State's argument was a proper statement of the law. See *People v. DeSavieu* (1983), 120 Ill. App. 3d 420, 458 N.E.2d 504.

●4 Last, when asserting an ineffective assistance claim the defendant may not merely claim that the jury "might have" applied a duty to retreat when it considered his self-defense claim; such an argument is merely speculation. The defendant must show that, had such an instruction been given, there is a *reasonable probability that* the outcome of the trial would have been different; that the jury

would have returned a not guilty or second-degree murder verdict. (See *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) In view of the totality of the evidence, we judge that the defendant has not shown that there is a reasonable probability that the verdict would have been different if the instruction had been given. For these reasons we hold that the defendant has failed to establish ineffective assistance of counsel.

The defendant has cited *People v. Howard* (1992), 232 Ill. App. 3d 386, 597 N.E.2d 703, and *People v. Newbolds* (1990), 204 Ill. App. 3d 952, 562 N.E.2d 1051. We agree with the State that both cases are distinguishable. In *Howard*, the defense attorney failed to request an instruction on the definition of "recklessness" in conjunction with an involuntary manslaughter instruction; the IPI committee comments state that the definition instruction should be given with an involuntary manslaughter instruction. In *Newbolds*, the reversible error focused on the failure of the defense attorney to tender an instruction on a necessity defense in an aggravated battery and an unlawful use of weapons charge. In both *Howard* and *Newbolds*, the instructions in issue were IPI instructions. Consequently, we do not see how they assist the defendant's position on this point.

●5 The defendant next contends that the trial judge abused his discretion in allowing into evidence post-arrest photographs of the defendant which were taken one year after the shooting. He argues that the photographs were not relevant to any material fact at issue and were merely graphic depictions of the defendant's gang membership, the admission and publication of which caused the defendant clear prejudice. We agree with the State that the photos were properly admitted because the defendant's appearance significantly changed before trial. At the time of his arrest the defendant had the letters "G" and "D" and the star of David cut into his hair; at trial he had no signs or letters cut into his hair.

The State had to prove that the defendant was the person who shot Polk. The defendant maintains that identification was not an issue because the defendant admitted that he was the person who fired the gun. But when the State was introducing its evidence in chief, it had no way of knowing with any certainty that the defendant was going to testify at all and, moreover, that he was going to testify and admit that he was shooter. The defendant's plea of not guilty put the State to its proof, and it had the right to present whatever evidence was probative to establish any of the elements of the crime and the identity of the defendant as the person who committed the crime. (See *People v. Botulinski* (1945), 392 Ill. 212, 64 N.E.2d 486.) Moreover, we fail to see how the introduction of the photograph

prejudiced the defendant because he admitted that he was a member of the Gangster Disciples at the time of the shooting and was still a member of the Gangster Disciples at the time that the photograph was taken.

The defendant's next contention is that the trial judge did not properly consider the goal of rehabilitation when the defendant was sentenced. The defendant was sentenced in 1990, when he was 22 years old. He had been convicted of armed robbery in 1989; as a juvenile he was sentenced to one year's probation for strong-arm robbery at age 16; a probationary term for theft and robbery and disorderly conduct at age 16; a probationary term for disorderly conduct at age 16; a probationary term for battery, assault, disorderly conduct, damage to property at age 17; he was later sentenced to the Juvenile Department of Corrections for residential burglary and strong-arm robbery. At the time of this offense, he was on parole from the Juvenile Department of Corrections, and a warrant subsequently was issued in August 1988 for a parole violation.

●6 The judge made remarks which disclose that he considered the nature of the crime, the attitude of the defendant as displayed by his testimony and his record. He concluded that he had no reason to believe that the defendant's attitude would change in the near future. He said that he regarded the defendant's potential for rehabilitation as minimal. It is clear, therefore, that the trial judge did consider rehabilitation and rejected it. We conclude, therefore, that the record fails to establish any abuse of discretion on the part of the trial judge. See *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

●7 The defendant's last argument is that the second-degree murder instruction violated the defendant's right to due process under the Illinois and Federal constitutions. The arguments advanced by the defendant have been rejected in *People v. Gore* (1991), 212 Ill. App. 3d 984, 571 N.E.2d 1041, *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335, *People v. De Oca* (1992), 238 Ill. App. 3d 362, 606 N.E.2d 332, and *People v. Willis* (1991), 217 Ill. App. 3d 909, 577 N.E.2d 1215. We adhere to the views expressed in those opinions.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.