2023 IL App (1st) 210768-U

No. 1-21-0768

Filed December 28, 2023

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 4836 |
| | ) | |
| CAMERON WHITE, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Hoffman and Ocasio III concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The defendant was permitted to testify to his state of mind in support of his claim of self-defense and defense of others. The defendant was permitted to make a meaningful closing argument. Trial counsel was not ineffective for failing to file a motion to suppress statements or a motion to exclude gang evidence.

¶ 2    A jury found Cameron White guilty of three counts of attempted murder for a shooting outside of a nightclub over his claim that he fired to defend himself and others. The circuit court sentenced him to an aggregate prison term of 62 years. On appeal, White argues (1) the trial court prohibited him from testifying to his state of mind, (2) the trial court prevented his attorney from

making a meaningful closing argument, and (3) his trial counsel was ineffective for failing to file motions to suppress his pretrial statements and bar gang evidence. We affirm.[1]

¶ 3                                                I. BACKGROUND

¶ 4         The shooting was captured on surveillance video, which was shown and admitted at trial, and many of the surrounding facts were not in dispute. White travelled from Waukegan, Illinois with several friends to The Shrine, a nightclub located on South Wabash Avenue in Chicago, to attend his birthday party on February 19, 2016. Arriving in a maroon or red Chrysler Pacifica, the group parked in front of the club's entrance. At some point after midnight, White was ejected from the club. Shortly afterward, a large fight broke out inside. Security guards escorted the combatants outside and a decision was made to close the club for the night. An ejected patron, James Friar, was verbally belligerent with security guards, prompting a guard to produce a baton. White, who was a friend of Friar's, joined him as the security guards followed Friar to a parking lot. After witnessing Friar discard a handgun underneath a car, the guards apprehended Friar, placed him in handcuffs, and walked him back toward The Shrine's entrance. White ran to the Pacifica and retrieved a handgun. While the security guards escorted Friar, several people attempted to intercede, verbally and physically, to free Friar. By the time the guards brought Friar to the entrance, a large crowd had gathered on the sidewalk. Tracy Davis, who had also been ejected, approached, and punched one of the guards. In the ensuing scuffle, a handgun fell from Davis's boot. Almost simultaneously, White, standing about 15 feet away near the Pacifica, fired two shots with a semiautomatic handgun. He quickly stepped behind the car and fired a third shot. Two people were struck by bullets. Tekira Holmes, a bystander, was hit in the head and left partially paralyzed. Michael Burke, a security guard, was struck in the leg below his knee. After firing the

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

shots, White entered the Pacifica. As bystanders pointed to him, a security guard approached and drew his handgun. White exited the car and fled on foot.

¶ 5    Six days later, White was arrested in Waukegan. Two Chicago Police Department detectives interviewed him at a Waukegan police station. White admitted to firing shots outside The Shrine but believed he had not shot Holmes or Burke because "the bullet would have had to have curved." After being transported to a Chicago police station, two different Chicago Police detectives interviewed White. He told them he pointed the gun at security guards and fired, hoping to scare them and enable Friar to escape. White was subsequently indicted for multiple counts of attempted murder, aggravated battery, and aggravated discharge of a firearm. He filed an answer indicating he would assert the affirmative defenses of self-defense and defense of others.

¶ 6    Before trial, the court conducted a hearing in accordance with *People v. Thompson*, 2016 IL 118667, ¶ 59, regarding the State's intention to introduce lay opinion identification testimony from Waukegan Police Detective Brian Falotico. At the hearing, Detective Falotico testified he had been assigned to a unit that monitored and gathered information on gangs. He first learned of White in 2013 after a vehicle in which White was a passenger was stopped and a handgun was discovered. The detective was not present for that stop but viewed booking photos of White. Later, Detective Falotico learned from informants that White was becoming "a predominant player" in the P. Stones gang in the Waukegan area. The detective then followed White's social media posts for several months. Over that time, Detective Falotico viewed White in over 50 photos or videos he had posted. In February 2016, Detective Falotico was asked to view surveillance video of the shooting outside The Shrine. He recognized White in the video. On February 26, Detective Falotico participated in surveilling White and arrested him after stopping the car White was driving. He had a brief conversation with White at that time.

¶ 7        After Detective Falotico's testimony, defense counsel indicated that he did not "have a problem with [Detective Falotico] testifying to what's in *Thompson*" but would file a motion *in limine* regarding prejudicial factors. The court found that Detective Falotico could offer lay identification testimony and stated that it would address the parameters of his testimony at another time.

¶ 8        Later, the State filed a motion to admit gang evidence. The motion asserted that several members of a faction of the Black P. Stones street gang, including White and Friar, attended a party at The Shrine the night of the shooting. The State claimed gang evidence was necessary to explain both why Detective Falotico was monitoring White's social media and why White fired at security guards—to prevent the arrest of Friar, a fellow gang member.

¶ 9        The record does not reflect a court ruling on the State's motion to admit gang evidence nor a filed or oral motion *in limine* regarding the parameters of Detective Falotico's testimony.

¶ 10        At trial, four security guards who worked at The Shrine the night of the shooting testified. Obinna Uwakwe was the security manager. Sometime before 2 a.m. on February 20, 2016, a "melee" broke out inside The Shrine after a patron threw a bottle at security guards. Security personnel escorted some of the combatants outside and walked them to a nearby parking lot. Uwakwe was alerted to a disturbance in the parking lot where other security guards had recovered a firearm. Upon walking to the parking lot, he observed two security guards, Dwight Flowers and Eric Salgado, detaining a man later identified as James Friar. The security guards walked Friar back toward the Shrine and encountered a "crowd" on the sidewalk. The crowd was comprised of patrons associated with a birthday party. Some attempted to intervene on Friar's behalf, urging the security guards to release him. Upon nearing The Shrine's front door, a fight broke out between members of the crowd and security guards. Uwakwe restrained a person who was attempting to

punch a guard. Uwakwe then heard three gunshots and he made his way safely inside. After "the smoke settled," Uwakwe went outside and discovered a security guard, Michael Burke, had been shot in the leg. He also viewed Holmes on the sidewalk, bleeding from her head. A red or maroon Chrysler Pacifica was parked on the street in front of the Shrine.

¶ 11     Surveillance video showing the exterior of the Shrine was played in court. As the video played, Uwakwe described events and identified some of the people depicted, including White. Uwakwe was permitted to exit the witness stand, stand near the screen, and point while narrating events. He explained that, beginning at 1:40 a.m., the video shows the security guards responding to the altercation he described earlier. According to Uwakwe's testimony, the video shows White exit the Chrysler and join Friar as Salgado and another security guard address Friar on the sidewalk at 1:48 a.m. Around 1:54 a.m., security guards are seen running toward the parking lot. Uwakwe explained they did so due to the report of a gun. Shortly after, White is seen returning and "gaining access into the Chrysler vehicle." The video shows White entering and exiting the Pacifica multiple times. Later, the video shows security guards bringing Friar toward the Shrine's entrance as individuals attempt to intercede and a crowd gathers. At 1:57 a.m., a man wearing bib overalls, later identified as Tracy Davis, runs toward the guards, and throws a "sucker punch," causing a "melee" on the sidewalk. A few seconds later, the video shows White—who was standing near the rear of the parked Chrysler Pacifica—extend his arm toward the melee and fire two shots. He quickly steps behind the rear of the vehicle and fires a third shot before entering the car from the street side. Holmes is lying on the sidewalk. On cross-examination, Uwakwe testified that the video showed Burke engaging Davis after the "sucker punch" and a handgun fell from Davis's boot onto the sidewalk.

¶ 12    Michael Burke testified consistently with Uwakwe. Burke pulled Davis from the melee on the sidewalk after observing him punch a security guard in the head. Davis then began fighting with Burke. A handgun fell from Davis's boot. Burke stepped on the gun and pushed Davis away to prevent Davis from obtaining it. A moment later, Burke was struck by a bullet just below his right knee. Like Uwakwe, Burke narrated events seen on the surveillance video, which was again played for the jury. Burke identified White in the video. He also identified Davis and another person who was standing beside Davis[2] when the fight outside The Shrine broke out. According to Burke, all three had arrived near the same time as White and were part of the same group attending White's birthday party. He said the three were together throughout the night. The State asked Burke what he thought was going to happen when he was fighting with Davis. Burke explained that he feared for his life since he observed a gun fall from Davis's boot and heard shots being fired but did not know where the shots came from. The bullet that struck Burke went through his leg. He spent three days in the hospital and required months of rehabilitation. He could no longer stand for long periods of time, precluding him from working security again.

¶ 13    Eric Salgado, a third security guard, gave an account consistent with Uwakwe's and Burke's. Salgado and another security guard named Mr. Gerardo[3] encountered Friar after he was ejected from The Shrine. Friar was verbally combative, and Mr. Gerardo drew his baton. White and a person who identified themselves as Friar's sister joined Friar and tried to calm him down. Friar "disappeared" but returned 10 minutes later. Salgado testified that Friar made a gesture to his waist toward Mr. Gerardo, indicating he possessed a handgun. Salgado was permitted to step down from the witness stand and demonstrate the gesture, which was described as placing his hand

---

[2]This individual was never identified by name at trial. The testimony suggests the person is someone other than Huley.

[3]Neither Salgado nor any other witness stated Mr. Gerardo's first name.

underneath his vest near his waist. The prosecutor asked Salgado what he believed the gesture meant. Salgado said he felt his life was threatened and it prompted him and Mr. Gerardo to draw their weapons. Friar then backed away and threw an object under an SUV in the parking lot. A sound of metal striking concrete followed. Salgado looked under the SUV and observed a handgun. He and Mr. Gerardo then detained Friar and walked him back toward The Shrine's entrance. After turning Friar over to other security guards, Salgado headed back to the parking lot. He then heard gunshots and returned to the front of The Shrine. Another security guard, Francisco Perez, directed him to the parked Chrysler Pacifica, stating the shooter was inside. Salgado drew his gun and moved toward the car. White emerged from the rear driver's side and ran away. As the previous two witnesses had done, Salgado narrated events as the surveillance video was shown. He added that Friar, although handcuffed, fled the scene after the shooting.

¶ 14        A fourth security guard, Francisco Perez, testified that he was called to assist other security guards in front of The Shrine after the fight inside prompted the club to close. Once there, he observed Friar in handcuffs and several people arguing with security guards. Perez took hold of Friar. Gunshots were fired from the area of the parked Chrysler Pacifica, 15 to 20 feet away. Perez let go of Friar, drew his weapon, and moved behind the Chrysler. Eventually, White exited the Chrysler and ran. Just like the three other security guards who testified, Perez narrated portions of the surveillance video played for the jury.

¶ 15        Detective Falotico testified that he was assigned to the Gang Intelligence Unit of the Waukegan Police Department and his duties included gathering information about gangs. Chicago Police Detectives asked him to view a video on February 22, 2016, in which he recognized White. Detective Falotico knew White from a "previous incident" in Waukegan, which prompted him to start monitoring White's social media posts. He was shown portions of the surveillance video from

the Shrine as well as still photos derived from the video. Detective Falotico identified White in each of them, including as the person seen firing shots while standing beside a Chrysler Pacifica.

¶ 16    On cross-examination, Detective Falotico testified he had monitored White's social media for at least three months prior to the shooting. The detective had been monitoring numerous other people as well. He recognized other individuals in the surveillance video from his social media monitoring. Detective Falotico was familiar with Ricky Huley but not Tracy Davis. He believed Huley was seen in the surveillance video. Defense counsel asked whether the person he pointed to on the video was Huley. Detective Falotico could not identify the individual. The detective admitted that nothing in the social media posts he followed was criminal and he was not aware of any interactions or association between White and Davis or Huley.

¶ 17    Chicago Police Sergeant Thomas Olson and his partner interviewed White at a Waukegan Police station on February 26. After being informed of and acknowledging his *Miranda* rights, White agreed to speak with them. White explained he had gone to The Shrine to celebrate his birthday. He got into a fight with security personnel and was thrown out. He was aware that Friar was being arrested. White told the detectives he did not believe he could have shot Holmes or Burke "because the bullet would have had to have curved." He did not give a reason for shooting. White was transported to a Chicago police station later that day. While there, White was shown still photographs from The Shrine's February 20 surveillance video depicting a person firing shots. He pointed to that person and said, "that's me right there." White was also shown a flyer advertising his birthday party. He said it was "self-explanatory."

¶ 18    On cross-examination, Sergeant Olson testified that White's statements were not recorded in any medium nor was he given the opportunity to write out his statement. White's waiver of his

*Miranda* rights and the substance of his statement were memorialized solely in the detectives' reports after speaking with him.

¶ 19    Daniel Ludwig, another Chicago Police Detective and with his partner Detective Lopez, spoke with White in the evening of February 26 at a Chicago Police station. Before questioning, Detective Lopez advised White of his *Miranda* rights. White chose to speak with them and said he rode to The Shrine with three friends in a red Chrysler Pacifica to celebrate his birthday. He was escorted out of the club and sat in the Pacifica. White noticed his friend, Friar, in an altercation with security guards. The security guards had seen Friar throw a gun underneath a car. Several people were trying to free Friar from the guards. White asked an occupant of the Pacifica for a "poe"—a handgun. After exiting the car, White "took the gun and he pointed it kind of in the direction of the security guards and he fired a shot." He explained that he wanted to distract and scare the security guards to enable Friar to get away. White then returned to the Chrysler Pacifica. Moments later, he heard a security guard yell that the shooter was inside the car. White panicked and ran one or two blocks before flagging down a taxi, which returned him to Waukegan. Detective Ludwig testified on cross-examination that he documented White's statements in a report. The conversation was not recorded, and he did not take contemporaneous notes.

¶ 20    White chose to testify in his own defense. A party at the Shrine was planned for his 25th birthday on February 19, 2016. A flyer promoting the party was disseminated on various social media platforms. Public promotion of the party made White "nervous." He was specifically nervous that Tracy Davis and Ricky Huley, with whom White had "an ongoing dispute out in the world," might view the flyer and show up at the party.

¶ 21    White rode from his home in Waukegan, Illinois with friends in a Chrysler Pacifica to the Shrine. White was aware that his friend, Akeem, had a handgun. They arrived around midnight

and parked directly in front of the Shrine as part of a "VIP thing." White noticed the security guards were armed with firearms.

¶ 22 After entering, White's group got into a dispute with the club's personnel regarding access to a VIP section and bottle service. Later, he had an altercation with a security guard who was "hitting on" his girlfriend. As a result, White was escorted outside.

¶ 23 After his ejection, White vomited on the sidewalk. He then sat in the Pacifica by himself. White noticed Friar, his friend, having some interaction with two security guards, one of whom was wielding a baton. White exited the car and joined Friar, hoping to defuse the situation. The two walked to the parking lot. While there, Friar tossed an object under a vehicle. White heard a sound of metal hitting concrete. He suspected Friar had thrown a handgun.

¶ 24 At some point, White observed Davis and Huley enter a vehicle. He saw Davis obtain a handgun but did not see what he did with it. Huley appeared to grab something as well and put it in his waistband, but White could not see what it was. White testified that seeing Davis with a handgun and Huley putting something in his waistband made him nervous and scared for both him and Friar. He ran back to the Pacifica to retrieve Akeem's handgun "[b]ecause [he] felt like something bad could happen if [he] didn't go grab a gun."

¶ 25 By this time, security guards had placed Friar in handcuffs. White explained that he believed he needed a gun since Friar was vulnerable to being attacked by Davis and Huley. A "crowd" moved towards The Shrine's entrance. White tried to "deescalate the situation" by pulling his girlfriend from the crowd.

¶ 26 White was permitted to step down from the witness stand, point to the video screen, and describe what was occurring in the surveillance video. He identified himself and pointed out the moment he pulled his girlfriend away. White then identified Huley in the video and testified that

he had seen him standing on the sidewalk, about 20 feet away, with his hand at his waistband. When asked how seeing Huley made him feel at the time, White answered, "[k]ind of like nervous and scared, and you know like in fear of him."

¶ 27        Continuing with the surveillance video, White pointed out that Huley stood in the same spot as Davis, while another person wearing a cream colored sweater, whom White did not know, initiated the fight with security guards on the sidewalk. White testified that he had observed Huley remain in the same spot at the time as well. His counsel asked, "Did that mean anything to you?" White answered, "Possibly like planned out or something."

¶ 28        White said he did not see the gun that had fallen from Davis's boot onto the sidewalk at the time but acknowledged that the video showed so. He also pointed out that the video shows Davis getting up from the ground and moving toward him after the gun fell and just before he began firing shots. White believed Davis still possessed a firearm at that time. He feared for his life and was scared that Davis or Huley might shoot him, one of his friends, or his girlfriend. When asked why he fired the gun, White answered that he was defending himself, Friar, and his girlfriend.

¶ 29        After firing three shots, White entered the Pacifica. Minutes later, he noticed security guards approaching the car with guns drawn. Fearing that he could be shot, White exited the Pacifica and ran. A friend picked him up a few blocks away.

¶ 30        Addressing Detective Ludwig's earlier testimony, White claimed that he did not remember making a statement about the direction he fired the gun when he was interviewed following his arrest. He was not offered any method of recording his statement at that time.

¶ 31        On cross-examination, White admitted that he was ejected from his birthday party and had been shoved by security guards. He further admitted that he ran to the Pacifica from the parking

lot and obtained a handgun after security guards detained Friar. While viewing the surveillance video again, White agreed that it showed he and Davis pass by one another a few times on the sidewalk. White said he was not scared of Davis at that time. White also agreed that the video never shows Davis and Huley together. He could not identify the time during the video when he had observed Davis obtain a handgun from a car with Huley. White admitted that he fired the shots that struck Holmes and Burke. He also admitted that he had not seen anyone draw a firearm before he fired shots.

¶ 32        Regarding his conversations with police following his arrest, White denied telling detectives that he fired in the direction of security guards. He gave conflicting answers as to whether he told the interviewing officers that he was scared. White admitted that he did not mention Huley but insisted that he did tell them about Davis. White further admitted that he had not viewed the surveillance video before speaking to police.

¶ 33        The State called Detective Ludwig in rebuttal. The detective reiterated that when he interviewed White on February 26, White told him that he fired at security guards. Detective Ludwig further testified that White never said that he was scared for his or anyone else's life, never mentioned that he observed Davis possess a firearm, never mentioned Huley, and never said he was afraid of Davis or Huley.

¶ 34        In closing arguments, defense counsel began as follows:

"MR. ERICKSON: What this video shows is not an attempt[ed] murder, but what it shows is an ambush. *** Mr. White is not a killer, did not try to kill Tekira Holmes or Mr. Burke. Mr. White is somebody that was acting in self defense.

Tracy [Davis] and Ricky [Huley] and the guy in the cream were long-time rivals of Mr. White and his friend. They came to Mr. White's birthday party and they came loaded with guns."

Counsel went on to point out that the surveillance video does not depict what was occurring out of the camera's view nor does it show White's perspective. He then suggested that the actions of Davis, Huley, and a third person showed "a coordinated attack." Huley stood still with his hand at his waist while everyone else scattered amid the chaos of the fight on the sidewalk. Huley's reaction, counsel contended, revealed "an attack was imminent *** an attack was just about to happen." Therefore, White "did what he thought he needed to do * * * he said that he feared for his life was when he recognized that ambush was occurring."

¶ 35        As his closing continued, counsel discussed other events shown on the video, which he claimed supported White's explanation for firing the gun. He also discussed White's credibility and offered various reasons why the jury should reject the evidence that White made inconsistent statements to police following his arrest—namely, because the statements were not recorded.

¶ 36        In rebuttal, the prosecutor began: "Ambushed * * * What you did hear was about an ambush. And the people that were ambushed were the security officers." She went on to argue that there was no imminent danger, White did not fire to defend himself or anyone else, and White fired at the security guards because they were "his problem," not because of Davis and Huley.

¶ 37        The jury found White guilty of three counts of attempted first degree murder and one count of aggravated battery with a firearm. They also found that White personally discharged a firearm that proximately caused great bodily harm to both Holmes and Burke. The trial court sentenced White to 31 years in prison on each of the attempted first degree murder counts related to Holmes

and Burke, which were ordered to be served consecutively, and a concurrent 26 years on the count related to Uwakwe. White received a concurrent term of 6 years on the aggravated battery count.

¶ 38        By supervisory order, this court was directed to allow White's motion for leave to file a late notice of appeal and treat it as properly perfected. *White v. Delort*, No. 127930 (Ill. Dec. 15, 2021) (supervisory order).

¶ 39                                II. ANALYSIS

¶ 40                        A. Right to Testify to State of Mind

¶ 41        On appeal, White contends that the trial judge prevented him from testifying to his state of mind and prevented his attorney from presenting a meaningful closing argument.

¶ 42        Regarding his testimony, White points to two portions of his direct testimony. As he was standing by the screen viewing surveillance video of the moments leading up to the shooting, White was asked:

"Q: Can you see *** what [Huley is] doing with his right hand?

A: It looks like he's holding something.

THE COURT: Sustained. It's subjective, its speculative."

White returned to the witness stand moments later and was asked:

"Q: Well, [Huley's] hand at his waistband, what does that gesture mean to you?

[PROSECUTOR]: Objection.

THE COURT: Sustained."

¶ 43        White argues the two evidentiary rulings noted above thwarted his ability to testify that he believed Huley was armed and foreclosed him from relying on that fact to explain why he fired shots in self-defense. Had he been permitted to answer, White asserts, his "complete testimony

would have included his inference that Ricky Huley was in possession of a firearm immediately prior to the shooting."

¶ 44      Evidentiary rulings are within the trial court's sound discretion and will not be disturbed unless the court abuses that discretion. *People v. Rios*, 2022 IL App (1st) 171509, ¶ 58. An evidentiary ruling constitutes an abuse of discretion when it is arbitrary, fanciful, or unreasonable. *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 27. "In criminal cases where the intention, motive or belief of the accused is material to the issue, [the defendant] is allowed to testify directly to that fact." *People v. Graves*, 61 Ill. App. 3d 732, 741 (1978). Self-defense necessarily involves the question of whether the defendant subjectively believed, at the time of the incident, that the force they used was necessary. *People v. Keefe*, 209 Ill. App. 3d 744, 751 (1991).

¶ 45      Regardless of whether the trial court's evidentiary rulings were proper, we do not find these two rulings had the effect of preventing White from testifying to his state of mind. "Where a claim of self-defense rests upon some reasonable basis, exclusion of state-of-mind testimony by a defendant will ordinarily constitute reversible error unless sufficient evidence of his intent is admitted at a subsequent stage of trial." *People v. Christen*, 82 Ill. App. 3d 192, 194 (1980).

¶ 46      For instance, in *Graves*, a defendant claimed he fired a pistol in self-defense during an altercation stemming from a barroom game of pool. *Graves*, 61 Ill. App. 3d at 738. After being threatened, the defendant retrieved a pistol from a back room and attempted to leave the bar. *Id*. The victim swung a pool stick at the defendant, who then shot him. *Id*. The defendant shot the victim a second time upon seeing him reach into his pocket. *Id*. The trial court precluded the defendant from testifying that the victim had threatened him with a knife on a prior occasion and that he knew the victim to carry a knife and handgun. *Id*. at 737. This court found the defendant should have been allowed to offer this testimony since believing the victim to be armed was

relevant to his state of mind—his intent, motive, and belief—before and during the shooting. *Id.* at 741.

¶ 47    Similarly, in *People v. Kline*, 90 Ill. App. 3d 1008, 1009-11 (1980), a defendant asserted that he shot three people in self-defense when he attempted to purchase narcotics as a police informant. This court found that the trial court erred by not permitting the defendant to testify why he brought a gun to the purchase, why he pulled the trigger, and how many people he expected to encounter when he went to the seller's home. *Id.* Testimony on these points was "essential to defendant's claim of self-defense" since it was "highly probative of the reasonableness of his actions which culminated in the shootings." *Id.* at 1014-15.

¶ 48    Likewise, in *Christen*, an 81-year-old defendant with physical disabilities claimed he shot a bar patron, who had threatened to fight him, in self-defense. *Christen*, 82 Ill. App. 3d at 194. The trial court sustained objections to the questions "Would you explain why you shot him?" "Could you have fought him?" and "Did you want to kill him?" *Id.* at 195. The defendant attempted to testify he did not want to kill the decedent, only to scare him. *Id.* This court found the defendant was "prevented from establishing that he did not intend to kill [the decedent] or, alternatively, that he reasonably believed that his own life was jeopardized requiring his resort to deadly force." *Id.*

¶ 49    Lastly, in *Keefe*, a defendant claimed he stabbed the victim in self-defense after the victim had pulled the defendant from a car and was strangling him. *Keefe*, 209 Ill. App. 3d at 752. This court found the trial court erred by barring the defendant from answering what he was feeling and whether he was afraid at that time. *Id.* The defendant's subjective feelings and whether he was afraid were relevant to "whether defendant was justified in using the force that he used." *Id.* at 753.

¶ 50    In each of these cases[4], the trial court's evidentiary rulings fully barred each defendant from testifying to some aspect of their state of mind; that is, to explain their intent, motive, or beliefs. Unlike those cases, the record here demonstrates that, apart from the questions he was not permitted to answer, White was permitted to give substantial testimony regarding his state of mind and the circumstances surrounding his actions. On direct examination, White testified he was nervous Davis and Huley would be at the club due to "an ongoing dispute." He explained that, after being ejected from the club, he observed Davis and Huley go to a car where Davis retrieved a gun and Huley grabbed something, which he put in his waistband. White stated those observations made him nervous and scared due to "bad blood" with Davis and Huley and he feared he and Friar could be in danger from them. White was permitted to answer why he retrieved a gun—because he "felt like something bad could happen if [he] didn't." He further testified that he was "nervous and scared, afraid of [Huley]" when he observed Huley standing on the sidewalk with his hand at his waist. White was permitted to explain that he suspected Davis and Huley were carrying out a plan when he observed Davis punch a security guard and Huley stand still despite the ensuing melee. Further, White testified he believed Davis still had a gun and had not seen the handgun that had fallen from Davis's boot. He also explained that he fired at Davis when Davis got up and moved in White's direction because, at that moment, he was scared and feared for his life. Ultimately, White was permitted to answer the question "Why did you fire the gun," stating he was defending himself, Friar, and his girlfriend.

¶ 51    Accordingly, White was permitted to give ample testimony as to his state of mind at the time of the shooting. He repeatedly testified that Davis and Huley's actions made him nervous and scared. And he was allowed to give a direct explanation of his intent—to defend himself, Friar,

_____

[4]The first three were cited in White's brief.

and his girlfriend. See *Christen*, 82 Ill. App. 3d at 195 (stating that "the defendant ha[s] the right to directly testify to his intent at the time of the occurrence").

¶ 52   In addition, although White's testimony did not include an explicit statement that *he* inferred Huley had a gun—as he argues on appeal—his testimony left an unmistakable implication for the *jury* to infer that White thought so. White testified that (1) he saw Huley take something from a car and put it in his waistband at the same time he observed Davis obtain a gun from the same car, (2) Huley held his hand near his waistband moments before the shooting, (3) he perceived Davis and Huley were acting in concert according to a plan, (4) Davis's and Huley's conduct made him nervous and scared, and (5) he feared he, Friar, or his girlfriend would be shot. From this, no reasonable juror could miss that White believed Huley possessed a firearm before White fired shots. We have held that a defendant is not prejudiced when they were able to elicit the same testimony to which the trial court *sua sponte* objected. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 120. Essentially, that is what occurred here.

¶ 53   In sum, considering White's testimony in its entirety, we cannot conclude that the trial court prevented White from testifying to his state of mind.

¶ 54                       B. Right to Make a Proper Closing Argument

¶ 55   White next argues that the trial court prevented him from making a meaningful closing argument. To be sure, the sixth amendment affords a criminal defendant the right to present a closing argument. *People v. Little*, 2018 IL App (1st) 151954, ¶ 60. If the trial court does not permit defense counsel to make a proper argument on the evidence and applicable law in the defendant's favor, a conviction should be reversed regardless of whether the defendant was prejudiced. *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003) (citing *Herring v. New York*, 422 U.S. 853, 864 (1975)). The trial court denies the defendant the right to make a proper closing argument by, for

example, repeatedly interrupting counsel, and effectively curtailing their argument. *People v. Heiman*, 286 Ill. App. 3d 102, 112-113 (1996) (trial court interrupted defense counsel's argument 40 to 50 times); *People v. Crawford*, 343 Ill. App. 3d 1050, 1060 (2003) (trial court interrupted defense counsel after two sentences and most of counsel's closing argument was interrupted).

¶ 56    On this issue, White points to three *sua sponte* objections from the court during defense counsel's closing argument. First, counsel argued the failure to record White's custodial statements was "shoddy police work." He then stated, "[y]ou should take those statements and toss them out the window." Without objection from the State, the court interjected:

"Ladies and gentlemen, an attorney's opinion as to what you should do with the evidence is to be disregarded. Their opinion is irrelevant. You are the triers of fact and you are to use your own recollection of the evidence in considering the weight to be given to each witness that testified in the case."

¶ 57    Second, counsel urged the jury to consider what the video shows Huley doing in the moments preceding the shooting. This line of argument culminated with, "Ricky still has his hand in his waistband. He is in position for the ambush." Again, without objection, the court interrupted:

"Sustained. Ladies and gentlemen, the characterization by attorneys in regard to the evidence is to be determined by the trier of fact, not by attorneys, and the attorneys are not to testify. So misrepresentation of evidence by the attorney is to be disregarded."

¶ 58    Lastly, counsel pointed out that a 9mm bullet was found in a location outside the view of the surveillance camera, no forensic evidence established which firearm fired the shot that struck Holmes, and none of the security guards' firearms were analyzed. Based on those circumstances, counsel suggested the police investigation was incomplete and asserted, "you are entitled to the

best evidence, but you didn't get it here. That's reasonable doubt, ladies and gentlemen." The court's third *sua sponte* objection followed:

"Jurors, not attorneys and nobody else, not even me, will define beyond a reasonable doubt. The triers of fact will. What the attorneys say in regards to reasonable doubt or any attempt to define it is inaccurate and wrong. And you will define that."

¶ 59    White contends that the trial court did not allow defense counsel to make the argument that "the shooting was justified because Huley took up a position close to White and Davis struck the security guard to create a distraction that would allow the men to attack White and/or Friar." Like the previous issue, regardless of the propriety of the trial court's interjections, we cannot conclude that the trial court deprived White from presenting a meaningful closing argument. The trial transcript demonstrates that White's attorney made a lengthy and comprehensive summation with the overarching theme that White fired in self-defense as he perceived that an armed Davis and Huley were executing an orchestrated plan to distract the security guards and attack White and Friar. The defense's closing argument fills 26 pages of trial transcript. Contrary to his claim on appeal, the defense's theory was abundantly clear in closing argument. In addition to explicitly stating that White "did what he thought he had to do" in response to the "coordinated attack" from Davis and Huley, counsel pointed out various aspects of the video and testimony that he believed supported that theory. Further, counsel addressed reasons to find White credible and reasons to discredit the purported prior inconsistent statement. Viewing the whole of counsel's argument, we cannot find that the three *sua sponte* objections had the effect of curtailing counsel's argument or preventing the defense from presenting its theory.

¶ 60    Regarding the objection to the "ambush" remark, we note that defense counsel previously used that term twice to describe Davis's and Huley's actions without objection. He also made a

similar remark calling their actions a "coordinated attack." Notably, counsel's argument appeared to prompt the prosecutor to use the term "ambush" herself in her rebuttal to refute the argument. Since counsel referenced the idea more than once and the State evidently felt the need to respond, the record only supports that the defense was able to make its argument and got its point across. Thus, we reject White's claim that the trial court violated his right to present a meaningful closing argument.

¶ 61        Nevertheless, White contends that he was prejudiced since the trial court's interjections distracted the jurors and affected the verdict. In White's view, the trial court impugned his counsel's integrity by accusing him of misstating the evidence and improperly defining reasonable doubt.

¶ 62        To warrant reversal, "[a] defendant must show that comments by the trial judge were prejudicial and that he was harmed by the comments." *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 57. But "[w]here it appears that the comments do not constitute a material factor in the conviction, or that prejudice to the defendant is not the probable result, the verdict will not be disturbed." *Id.* (quoting *People v. Williams*, 209 Ill. App. 3d 709, 718 (1991).

¶ 63        Here, we do not find that the trial judge's comments were a material factor in White's conviction. The evidence was not closely balanced. The shooting was caught on The Shrine's surveillance video, which clearly shows White fire three shots toward a crowd of people. The video does not support his claim that he fired to defend himself, Friar, or his girlfriend. It shows no apparent threat to any of them. While the video shows Davis attacking a security guard, no action by him or Huley appears directed toward White, White's girlfriend, or Friar. Indeed, neither Davis nor Huley appears to pay any attention to the three of them. When White fires the first two shots, Davis is in the general vicinity of where White pointed the gun, but so were numerous other people,

including some in between White and Davis, such as Holmes and security guards. In addition, most people on the sidewalk, including Huley, scattered after White fired the first two shots. Yet, White stepped from behind the Pacifica to fire a third shot in the direction of security guards, striking Burke. In addition, notwithstanding the court's two evidentiary rulings, White was permitted to fully explain his beliefs, motive, and intent to the jury, which the jury could evaluate against a clear video showing his actions and the surrounding circumstances. We do not believe the court's comments during closing argument materially affected the jury's verdict.

¶ 64                    C. Ineffective Assistance of Trial Counsel

¶ 65        We turn to White's claim of ineffective assistance of trial counsel. White contends his trial counsel was ineffective for failing to file a motion to suppress his initial statements to police and for failing to file a motion to exclude gang evidence. To prevail on a claim of ineffective assistance, a defense must satisfy the two-pronged standard established in *Strickland v. Washington*, 466 U.S. 668 (1984): (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. *People v. Randall*, 2021 IL App (1st) 191194, ¶ 62. To establish prejudice, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Johnson*, 2021 IL 126291, ¶ 52. "Where an ineffectiveness claim is based on counsel's failure to file a suppression motion, in order to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 66        Here, White's ineffectiveness claim related to his custodial statements relies solely on trial testimony from Sergeant Olson and Detective Ludwig and a comment White's attorney made.

When establishing the foundation for White's statements, Sergeant Olson answered "Yes" to the prosecutor's question of "And was he told that if he needed an attorney one could be given to him or appointed free?" Similarly, Detective Ludwig answered "Yes" to "Did [Detective Lopez] indicate that the defendant had the right to have an attorney present *** or one would be appointed free?" Outside the presence of the jury, White's attorney stated on the record that the court precluded him from questioning the testifying officers about the circumstances of White's statements but had allowed the State to ask such questions. The ensuing discussion with the court and prosecutor contained references to *Miranda* warnings. Based on these portions of the trial transcripts, White argues that the *Miranda* warnings were deficient because they failed to inform him that he had a right to consult with an attorney before and during questioning. See *Florida v. Powell*, 559 U.S. 50, 61 (2010) (adequate *Miranda* warnings must convey the right to consult with counsel before and during questioning).

¶ 67    We cannot find that a motion to suppress White's custodial statements would have had merit or that the outcome of his trial would have been different had his statements been suppressed. The language White relies on came from the prosecutor in the form of a question. The officers did not testify to a verbatim recitation of what White was told. Nothing in the trial transcript suggests the prosecutor's words were intended to represent such. Rather, as phrased, she appeared to ask about the gist of what White was told, not exact words. Thus, the record is insufficient to establish that White was given deficient *Miranda* warnings. Yet, even if White's statements had been suppressed, we do not find a reasonable probability exists that his trial would have had a different outcome. Although suppression would prohibit the State from introducing his statements in its case in chief, the State could introduce evidence of his statements to impeach his inconsistent

testimony. See *People v. Sanders*, 2021 IL App (5th) 180339, ¶ 36 (statements suppressed pursuant to *Miranda* admissible to impeach defendant who gave inconsistent testimony).

¶ 68    Aside from White's failure to show prejudice, he cannot establish deficient performance. Nothing in the record supports that counsel was apprised that White may have been given deficient *Miranda* warnings. To be sure, counsel's attempt to question the officers about *Miranda* warnings appears to have been prompted by the State's questioning at trial. Thus, this part of White's ineffectiveness claim relies on hindsight. See *Strickland*, 466 U.S. at 689 (courts should make every effort "to eliminate the distorting effects of hindsight *** and to evaluate the conduct from counsel's perspective at the time.").

¶ 69    Next, White claims his trial counsel was ineffective for failing to file a motion *in limine* to exclude gang evidence. In the pretrial hearing regarding Detective Falotico's identification of White, Falotico stated that he learned White was "a predominant player" in the Black P. Stones gang in Waukegan while explaining why he was monitoring White's social media. At trial, Detective Falotico did not mention White's affiliation with a gang but testified that he was assigned to the Waukegan Police Department's Gang Intelligence Unit where his duties included "shooting investigations, narcotics investigations, and anything that in regards to gang intelligence, gathering intelligence on individuals, gang associates, and stuff like that." He also stated that he first learned of White from a "prior incident" that was brought to the Gang Intelligence Unit's attention. On appeal, White argues the gang references in this testimony were unduly prejudicial as it was unnecessary to explain Detective Falotico's ability to identify White and, instead, suggested White had a propensity to commit an unlawful shooting due to gang involvement.

¶ 70    We note that White's attorney informed the trial court he intended to file a motion *in limine* to limit Detective Falotico's testimony, but the record shows no such motion was filed. Similarly,

the State filed a motion to admit gang evidence indicating that it intended to present evidence of White and Friar's common gang association to demonstrate White's motive for shooting at the security guards. The record shows no argument or ruling on the State's motion. However, the State did not present that theory at trial.

¶ 71 We agree that Detective Falotico's references to the Gang Intelligence Unit while explaining why he was monitoring White's social media amounted to tacit evidence that White was a member of a gang. Evidence of gang affiliation is admissible only when relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003). We likewise agree that it was unnecessary for Detective Falotico to mention the Gang Intelligence Unit at trial to establish a foundation for his identification of White. Just as he modified his testimony between the pretrial hearing and trial from mentioning White in connection to a handgun recovery to "a previous incident," Detective Falotico could have merely said he was a Waukegan police officer at trial.

¶ 72 Nevertheless, we do not find that Detective Falotico's brief reference to gang evidence prejudiced White. As we observed, the trial evidence was not closely balanced. The video evidence was compelling and failed to support White's claims of self-defense and defense of others.

¶ 73 In addition, we cannot discount that White's attorney did not oppose or object to Detective Falotico's gang references as a matter of trial strategy. "To establish deficient performance, defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 42. "It is nearly axiomatic that counsel's choice of trial strategy is virtually unchallengeable and will generally not support an ineffective assistance of counsel claim." (Internal quotation marks omitted.) *Id*. ¶ 43. To be sure, White's testimony and his attorney's closing argument insinuated

that rival gang affiliation underlay White's belief in the need to defend himself and Friar. White testified he was afraid Davis and Huley would attend his party due to "bad blood" and "an ongoing dispute out in the world." Counsel described them as having a "feud." When cross-examining Detective Falotico, counsel asked him whether he had observed Davis or Huley when monitoring White. The negative answer suggested Davis and Huley were not affiliated with White. Thus, evidence suggesting rival gang affiliation could serve to bolster that White subjectively believed he and Friar were in danger from Davis and Huley and that his belief was reasonable.

¶ 74     In sum, White cannot overcome the presumption that his attorney's failure to challenge gang evidence was trial strategy and he has not demonstrated resulting prejudice. Therefore, we find he has not made the requisite showing to prevail on this part of his ineffectiveness claim.

¶ 75                                III. CONCLUSION

¶ 76     Based on the foregoing, we affirm the judgment of the trial court.

¶ 77     Affirmed.